STATE of Minnesota, Respondent,

v.

Margaret Mary KINSKY, Appellant.

No. C3–82–1437.

Supreme Court of Minnesota.

April 27, 1984.

320

Douglas W. Thomson and Deborah Ellis, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Jr., Janet Newberg Anderson, Sp. Asst. Attys. Gen., St. Paul, Julius E. Gernes, Winona County Atty., Winona, for respondent.

SCOTT, Justice.

On April 20, 1982, defendant Margaret Kinsky was charged by complaint with second-degree murder in violation of Minn. Stat. § 609.19(1) (1982), in connection with the death of her newborn infant.[1] Following a jury trial in Winona County District Court, she was convicted of that crime and sentenced to a term of 121 months. Defendant appeals, challenging both the conviction and the sentence. We affirm.

Defendant graduated from high school in the spring of 1980 and entered Winona State University in Winona, Minnesota, that fall. Sometime in late August or early September of 1980, she discovered that she was pregnant. She delivered the child at the Winona Hospital on January 28, 1981, and it was subsequently placed for adoption. Defendant successfully concealed that pregnancy from family and friends. Her parents did not learn about the birth until they received a hospital bill in the mail for delivery expenses. After bearing the child, defendant completed her freshman year that spring.

Defendant returned to school that fall to begin her sophomore year. Following fall quarter, she lived with Colleen Hicks in Room 310 of Conway Hall, a dormitory located on the campus of Winona State University. In late October or early November, defendant discovered that she was pregnant again. She testified that she planned "to do as [she] did before." Although none of her friends learned of her pregnancy, some did notice that she seemed to be gaining weight during the latter part of 1981 and early 1982. She explained to them that members of her family tended to gain weight in the abdominal area.

On April 17, 1982, defendant went to bed at about 1:00 a.m. Her roommate, who slept on a bunk bed above defendant, had retired somewhat earlier. About 3:00 a.m., defendant awoke with slight abdominal cramps, thought nothing of it, and fell back to sleep. Sometime later, strong labor pains caused her to reawaken. While she lay in bed wondering what to do, her pains became "real strong" and she felt a strong urge to "push." She never attempted to awaken her roommate or call anyone for help. At approximately 7:00 a.m., defendant delivered the baby.

Sometime after delivering the baby, she wrapped it in her sheets and put them in a

---

1. Minn.Stat. § 609.19(1) provides: "Whoever does * * * the following is guilty of murder in the second degree and may be sentenced to imprisonment for not more than 40 years: (1) Causes the death of a human being with intent to effect the death of that person or another, but without premeditation * * *."

trashcan. Her roommate awoke at that time and witnessed defendant placing her sheets in the trashcan. Defendant told her that she was throwing her sheets away because she had a "bad period."

Jill Foster, another Winona State University student, recalled seeing defendant walking away from the dumpster outside Conway Hall at approximately 9:00 a.m. on April 17, 1982. At that time, defendant was wearing pajamas and a robe and carrying a trashcan. Defendant recalled seeing Foster that morning, but she did not remember going to the dumpster.

Clifford Waletske was riding his bicycle in the area of the Winona State University campus that morning. At approximately 9:45 a.m., he stopped to look for aluminum cans in the dumpster outside Conway Hall. Upon looking into the dumpster, he observed an infant's body wrapped in a brown blanket. Shortly thereafter, he informed two police officers about his discovery. The two officers proceeded immediately to the dumpster and there observed the body of an infant lying face down in the garbage. More officers arrived at the scene shortly thereafter. The body of the infant, as well as other evidence, was removed from the dumpster, placed in a plastic bag, and then transported to the morgue. At the morgue, several officers observed a brassiere tied around the infant's neck.

Dr. Donald Morris, the Winona County Medical Examiner, performed a preliminary examination of the baby at approximately 10:30 or 11:00 a.m. and concluded that it was born full term, with the head appearing first. He observed a brassiere "very tightly secured" around the infant's neck. He testified that he had difficulty inserting his finger between the brassiere and the baby's neck because it was so "tightly secured." X-rays established that the baby's lungs were "well aerated." Based on the X-rays and his examination, he opined that the cause of death was asphyxiation by strangulation. He estimated the time of death to be the evening of the 16th or the early morning of the 17th.

Dr. Charles Nichols, a pathologist, conducted the autopsy of the infant that day. He testified that the brassiere tied around the baby's neck was "tight, very tight" and that he was unable to slip his fingers between the brassiere and the soft tissues of the baby's neck. Based on his examination, he concluded that the baby died of asphyxiation secondary to strangulation and that the brassiere caused the death.

Meanwhile, about noon that same day, defendant and a friend, Ann Kalis, rode bicycles to a gymnastics meet at a nearby YWCA. They remained at the meet approximately one hour and then returned to their dormitory. Kalis testified that defendant did not appear to be experiencing any problems during the meet. Later that afternoon, defendant went with a group of friends to a party at a nearby lake. While there, she drank some beer and appeared to be acting "normal." That evening, she attended a "kegger" with friends. She appeared to be tired at that party, but otherwise "normal."

Defendant attended church on Sunday morning, April 18, 1982, and spent the afternoon studying by the lake. She appeared to be "fine" that day. Defendant testified that she was tired during the weekend, but her "frame of mind was normal." She further stated that she "was acting [her] normal self" during that time.

On Monday morning, defendant left her dormitory to register for the next semester. Upon returning to the dormitory, she was met by two police officers. Defendant was then taken to the Winona Law Enforcement Center for questioning. She initially denied that she had ever been pregnant and that the baby was hers. Later that same day, she admitted to being the baby's mother and gave the police a statement. She told the police that the baby was dead when it was delivered. However, she further told them that she "wrapped the bra around its neck just to make sure that it wasn't alive." She then admitted wrapping the baby in sheets, putting them in the trashcan and finally emptying the contents into the dumpster. After giving

the statement, defendant was placed under arrest.

The following issues are presented on appeal:

(1) Whether the trial court abused its discretion by failing to grant defendant's motion for a change of venue or a continuance.

(2) Whether there existed sufficient evidence to support defendant's second-degree murder conviction.

(3) Whether the trial court erred by failing to instruct the jury on the lesser offense of concealing birth.

(4) Whether the trial court erred by refusing to depart either durationally or dispositionally from the presumptive sentence.

1. Just prior to the final jury selection, defendant moved for continuance or a change of venue on the ground that pretrial publicity would prevent her from receiving a fair trial. The district court denied that motion. On appeal, defendant claims that ruling denied her a fair trial. In *State v. Beier*, 263 N.W.2d 622 (Minn. 1978), this court stated:

> We start with the proposition that while pretrial publicity may jeopardize a defendant's right to a fair trial by an impartial jury, no *presumption* of prejudice arises unless there is massive publicity surrounding the trial. * * * Stated differently, a defendant in a criminal case seeking reversal on this ground must show he actually was prejudiced by the publicity.

263 N.W.2d at 625–26 (citations omitted).

■ Where a defendant has moved for continuance or a change of venue because of prejudicial publicity, the trial court must determine whether "the dissemination of potentially prejudicial material creates a reasonable likelihood that in the absence of such relief, a fair trial cannot be had." Minn.R.Crim.P. 25.02, subd. 3. The trial court has wide discretion in determining whether such relief should be granted. *State v. Salas*, 306 N.W.2d 832, 835 (Minn. 1981). This court will not reverse the trial court's determination "unless there has been a clear abuse of discretion." *State v. Gilbert*, 268 N.W.2d 576, 581 (Minn.1978).

In the instant case, defendant did not introduce into evidence any of the allegedly prejudicial news articles. Nor did she submit any evidence of "qualified public opinion surveys" or "other materials having probative value," as permitted by Minn.R. Crim.P. 25.02, subd. 2. Rather, she contends, as she did below, that the voir dire established that an impartial jury could not be obtained because the prospective jurors revealed that they had been exposed to pretrial publicity and had formed opinions about defendant's guilt.

■ Where, as here, defendant's motion is based on the prospective jurors' answers during voir dire, defendant must "do more than elicit an admission from the potential juror that he has been exposed to pretrial publicity." *Beier*, 263 N.W.2d at 626; *see also State v. Webber*, 292 N.W.2d 5, 12 (Minn.1980). Prospective jurors cannot be presumed partial solely on the ground of exposure to pretrial publicity. *See Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Salas*, 306 N.W.2d at 836. With our present methods of communication, it is unlikely that "any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43. The test is whether a prospective juror can set aside his impression or opinion and render an impartial verdict. *Id.* at 723, 81 S.Ct. at 1642; *Webber*, 292 N.W.2d at 12; *see also State v. Howard*, 324 N.W.2d 216, 220 (Minn.1982).

■ The instant record is simply inadequate to permit review of whether the pretrial publicity made the setting of the trial inherently prejudicial. On appeal, defendant presented the voir dire of only five prospective jurors. In fact, one of those jurors was primarily challenged on grounds unrelated to the potentially prejudicial pretrial publicity. We cannot, as defendant suggests, infer that the responses of those prospective jurors represent the sentiment

of either the community or the jury panel. Defendant must make a greater showing to establish the need for continuance or a change in venue.

Moreover, only three of the five prospective jurors in question served on defendant's jury. Defendant removed two prospective jurors by using two of her five peremptory challenges. Even assuming those two prospective jurors were biased, defendant has failed to show any actual prejudice. "[P]rejudice among some voir dire examinees * * * does not mean that the jury was biased." *Salas,* 306 N.W.2d at 836; *see also Mastrian v. McManus,* 554 F.2d 813, 818 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977).

The three jurors in question who served at defendant's trial admitted to having formed impressions about defendant's guilt from the pretrial publicity, but each also claimed that he or she had not formed a fixed opinion and could be fair and impartial. Those jurors underwent extensive questioning on an individual basis by counsel for both sides and the court. In the past, we have noted that the trial court is in a better position to determine whether the jurors can be impartial because it hears the prospective jurors' testimony and observes their demeanor. *Beier,* 263 N.W.2d at 627. We have stated, "If * * * the jurors indicate their intention to set aside any preconceived notions, and demonstrate to the satisfaction of the trial judge that they are able to do so, this court will not lightly substitute its own judgment." *Howard,* 324 N.W.2d at 220. We find no reason to substitute our judgment here. In conclusion, defendant failed to show a real possibility that the pretrial publicity interfered with an impartial verdict and, therefore, we must hold that the trial court did not abuse its discretion by denying defendant's motion for continuance or a change in venue. *See Salas,* 306 N.W.2d at 836.

2. Defendant challenges the sufficiency of the evidence to support her second-degree murder conviction under Minn. Stat. § 609.19(1). To sustain a conviction under that statute, the state must have shown that defendant caused "the death of a human being with intent to effect the death of that person or another, but without premeditation." This court views the evidence in the light most favorable to the state and determines whether the jury reasonably could have found the accused guilty of second-degree murder. *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn. 1980).

Defendant first claims that the state failed to prove the infant was born alive and, therefore, it necessarily failed to prove that the infant's death resulted from any criminal act committed by her. We disagree.

The following evidence tended to show that the infant was born alive. X-rays established that the infant's lungs were "well aerated." Dr. James Testor, a radiologist, testified that air in the lungs is consistent with live birth. In contrast, if the infant had been stillborn, there would have been an absence of air. He further testified that there was a small amount of air in the infant's stomach and that air would have been swallowed during the breathing process. Based on his examination of the X-rays, he opined that the infant was born alive. He also admitted, however, that the X-rays were consistent with the infant's having taken just one or two breaths. Dr. Nichols, the medical examiner, testified that the lungs were fully inflated and that they floated in water. Those findings indicated that the infant's lungs contained air. He also admitted that the air in the lungs could have come from one or two breaths.

Defendant contends that merely showing air in the infant's lungs and stomach is insufficient proof that it was born alive. She correctly points out that other courts have conceded that the lung flotation test fails to conclusively prove whether or not an infant was born alive. *See State v. Collington,* 259 S.C. 446, 450–51, 192 S.E.2d 856, 858 (1972). Furthermore, there exists authority that the state must prove

that the infant was "born alive and had an independent and separate existence from its mother," and evidence that the baby breathed, without more, is insufficient proof of that element. *See Montgomery v. State*, 202 Ga. 678, 681, 44 S.E.2d 242, 244 (1947); *Jackson v. Commonwealth*, 265 Ky. 295, 296, 96 S.W.2d 1014, 1014 (1936); *Lane v. Commonwealth*, 219 Va. 509, 514, 248 S.E.2d 781, 783–84 (1978).

In the instant case, however, there was additional evidence from which the jury could have found that the infant was born alive. Dr. Morris observed that the infant had livor mortis in the face and neck and that a brassiere was "tightly secured around the infant's neck." Livor mortis is a discoloration of the skin tissues. It is "caused by stagnation of the blood in a particular location of the body," where the blood becomes trapped and is unable to return to the heart. Thus, the presence of livor mortis implied that something prevented the blood from returning to the heart. Finally, both Dr. Morris and Dr. Nichols opined that the infant was strangled to death with a brassiere.

Other courts have upheld murder convictions where the state proved that the infant breathed and that its death was caused by strangulation. *See Jackson*, 265 Ky. at 299, 96 S.W.2d at 1015; *Collington*, 259 S.C. at 451, 192 S.E.2d at 858; *Heubner v. State*, 131 Wis. 162, 165–66, 111 N.W. 63, 64 (1907); *Bennett v. State*, 377 P.2d 634, 636 (Wyo.1963). In those circumstances, the jury could infer that the infant was born alive; otherwise there would have been no reason for the accused to strangle it. *Collington*, 259 S.C. at 451, 192 S.E.2d at 858; *Bennett*, 377 P.2d at 637. Thus, there was sufficient evidence that the infant was born alive and that defendant caused its death.

Defendant next claims that the evidence is insufficient to support a finding that she intended to kill the infant. There is no merit to that argument.

 Intent "means that the actor either has a purpose to do the thing or cause the result specified or believes that his act, if successful, will cause that result. In addition, * * * the actor must have knowledge of those facts which are necessary to make his conduct criminal and which are set forth after the word '[intent]'." Minn.Stat. § 609.02, subd. 9(3) (1982). In the instant case, the jury could have inferred intent to kill from the fact that defendant tied a brassiere tightly around the infant's neck. Moreover, defendant told the police that she "wrapped the bra around its neck just to make sure it wasn't alive." We hold that there was sufficient evidence that defendant intentionally caused the infant's death.

3. The trial court refused to instruct the jury on the offense of concealing birth, Minn.Stat. § 617.22 (1982), as requested by defendant. On appeal, defendant argues that the trial court prejudicially erred by failing to give the requested instruction, claiming that the offense of concealing birth is a lesser-included offense of murder.

 The trial court is required to instruct the jury on a lesser offense "only if the offense is a so-called lesser-included offense and only if there is evidence which produces a rational basis for a verdict acquitting defendant of the offense charged and convicting him of the lesser offense." *State v. Nurmi*, 336 N.W.2d 65, 67 (Minn. 1983). In the instant case, the offense of concealing birth would be a lesser-included offense only if it were "[a] crime necessarily proved if the crime charged were proved." Minn.Stat. § 609.04, subd. 1(4) (1982).[2] In determining whether a lesser

---

**2.** Minn.Stat. § 609.04, subd. 1, further provides that:

An included offense may be any of the following:

(1) A lesser degree of the same crime; or

(2) An attempt to commit the crime charged; or

(3) An attempt to commit a lesser degree of the same crime; or * * * *

(5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.

offense is "necessarily included" within another offense, "the trial court must look at the statutory definitions rather than the facts in a particular case to determine if the lesser offense is necessarily included." *State v. Gayles,* 327 N.W.2d 1, 3 (Minn. 1982). If a person can commit the greater offense, as legally defined, without committing the lesser offense, as legally defined, then the lesser offense is not necessarily included within the greater offense. *Id.*

 One who "shall endeavor to conceal the birth of a child by any disposition of its dead body, whether the child died before or after its birth * * *," is guilty of the misdemeanor offense of concealing birth. Minn.Stat. § 617.22. As that crime is legally defined, it is clear that a person can commit second-degree murder, as legally defined, without committing the offense of concealing birth, as legally defined. Therefore, concealing birth is not necessarily included within the offense of second-degree murder. Accordingly, the trial court did not err here.

4. Under the Minnesota Sentencing Guidelines, the presumptive sentence for one convicted of second-degree murder who has a criminal history score of zero is 116 months (111–121), with the sentence executed.[3] Following the jury's verdict, defendant moved for a departure from the sentencing guidelines, primarily requesting that her sentence be stayed. A sentencing hearing was held on October 21, 1982. Defendant presented evidence at that hearing tending to show that she would be particularly amenable to treatment in a probationary setting.

Following the hearing, the trial court imposed the maximum sentence without departing from the sentencing guidelines (121 months), with the sentence executed. In refusing to depart either durationally or dispositionally, it focused on the gravity of the crime and emphasized that defendant's

conduct manifested "a shocking disregard for the value of human life in infancy." In a sentencing statement, the trial judge noted that some of the factors present would have supported an upward departure in defendant's sentence, particularly the "vulnerability of the victim, her frailty, her absolute and total dependence upon her mother, the sudden manner in which her life was ended, and the indignity suffered upon her remains."

 On appeal, defendant claims the trial court erred by refusing to depart either durationally or dispositionally. This court has stated that there must exist " 'substantial and compelling circumstances' justifying departure." *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981). The trial court gave valid reasons for adhering to the presumptive sentence. The vulnerability of the victim is expressly mentioned by the sentencing guidelines as an aggravating factor. Where valid reasons support its refusal to depart downward durationally, we will not interfere with the trial court's exercise of discretion. *See State v. Kindem,* 313 N.W.2d 6, 7–8 (Minn.1981).

 It is a separate question whether the trial court erred by failing to depart dispositionally. "[A] sentencing court may stay execution of a presumptively executed sentence if the facts indicate that the defendant is particularly amenable to treatment in a probationary setting." *State v. Bentley,* 329 N.W.2d 39, 40 (Minn.1983); *see also State v. Trog,* 323 N.W.2d 28 (Minn.1982); *State v. Wright,* 310 N.W.2d 461 (Minn.1981). Yet, we have stressed that the sentencing court has broad discretion in this matter, and we generally will not interfere with the exercise of that discretion. *State v. Hines,* 330 N.W.2d 878, 879 (Minn.1983); *Bentley,* 329 N.W.2d at 40. The sentencing court was clearly not required to depart dispositionally and place

---

Under those definitions, the offense of concealing birth is clearly not a lesser-included offense of second-degree murder.

**3.** Effective November 1, 1983, the presumptive sentence for one convicted of second-degree in-

tentional murder who has a criminal history score of zero was increased to 120 months (116–124). The crime for which defendant was convicted occurred before that recent amendment.

defendant on probation in the instant case. Accordingly, we affirm defendant's sentence in all respects.

Affirmed.