STATE of Minnesota, Respondent,

v.

Samantha Anne HEIGES, Appellant.

No. A09–300.

Court of Appeals of Minnesota.

March 30, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and James C. Backstrom, Dakota County Attorney, Scott A. Hersey, Assistant County Attorney, Hastings, MN, for respondent.

Deborah Ellis, St. Paul, MN, for appellant.

Considered and decided by MINGE, Presiding Judge; BJORKMAN, Judge; and RANDALL, Judge.

## OPINION

BJORKMAN, Judge.

Appellant Samantha Anne Heiges challenges her conviction of second-degree murder for the death of her newborn daughter. Heiges contends that (1) there

was insufficient evidence to corroborate her confessions to the police under Minn. Stat. § 634.03; (2) the district court erred in instructing the jury on the burden of proof and duress; (3) the district court erred by allowing testimony of a prosecution witness who was discovered mid-way through the trial; and (4) the district court abused its discretion in imposing a guidelines sentence. We affirm.

## FACTS

Heiges became pregnant in 2004. At that time she was 19 and lived with the father of the child, E.M. Heiges's relationship with E.M. was marked with verbal, emotional, and physical abuse. According to Heiges, E.M. threw beer cans at her, punched the wall of their apartment, and frequently threatened her. Heiges's friends noticed that she occasionally had bruises and scratches. Heiges admitted that she feared E.M., but she always felt that she could take care of herself.

When Heiges learned she was pregnant, E.M. was initially excited, but he soon changed his mind and demanded that she not have the child. Heiges did not wish to abort the child, and E.M. opposed giving the child up for adoption. Heiges continued the pregnancy, but she received no prenatal care and took steps to hide her pregnancy from family and friends. Despite her efforts at concealment, several staff members at her apartment complex and friends learned of the pregnancy.

In April 2005, one of Heiges's classmates, R.C., asked Heiges if she was pregnant. Heiges admitted that she was and said that she and E.M. were trying to induce a miscarriage by having her take drugs, drink alcohol, and starve herself. Heiges further stated that if these efforts to end the pregnancy did not succeed, she and E.M. planned to go up north to a family cabin, deliver the child, and bury it

in the woods. R.C. told Heiges that she could live with her and give the child up for adoption or leave it at a hospital. Heiges declined the offer of assistance, stating that she did not want to leave E.M. R.C. reported this information to the Eagan Police Department on April 14, 2005, but the department did not locate Heiges until September, at which time she denied ever being pregnant.

On or about May 5, 2005, Heiges went into labor, drew herself a bath, and delivered a baby girl. Heiges claimed that she was prevented from lifting the child out of the water by E.M., who told her to hold the child under the water and not allow it to breathe. The child appeared to be trying to cry under the surface of the water. Heiges acknowledged that it took a couple of minutes for the infant to drown.

Heiges placed the child's body in a shoebox and went to work. A few days later, Heiges found the shoebox in a garbage bag. She and E.M. placed the bag in the apartment building's garbage chute.

Approximately one week later, E.M. found Heiges in the bathtub with her wrists slit. She had written SYD, the first three letters of the child's intended name, Sydney, in blood on the tiles surrounding the bathtub. E.M. removed Heiges from the bathtub and applied pressure to stop the bleeding. But he did not seek medical assistance for Heiges because he had outstanding arrest warrants. Heiges ended her relationship with E.M. a few months later.

Heiges met A.B. in October 2006. During the early morning of January 1, 2007, A.B. accompanied Heiges to her apartment. After they had sexual intercourse, Heiges began to cry uncontrollably. She told A.B. about her child. A.B. initially assumed that she had given the child up for adoption or had a late-term abortion. But Heiges told him that "she had actually

physically killed it." Specifically, she had "drowned it in the [bath]tub." She also told A.B. that the child's body had been thrown down a garbage chute. Later that day, A.B. met with Detective Jeffrey Pfaff of the Burnsville Police Department and relayed the information Heiges had provided.

On January 30, 2007, Detective Pfaff and another detective interviewed Heiges at her apartment. Detective Pfaff used a hidden device to record the conversation. He used special interviewing techniques to build a rapport with Heiges, never told her that she was a suspect, and led her to believe that E.M. was the focus of the investigation. He also used leading questions based on A.B.'s statement to direct the interview.

Detective Pfaff interviewed Heiges three times over six months. During the first interview, Heiges initially stated that the child wasn't born alive. But when Detective Pfaff indicated that they had heard otherwise, Heiges admitted that the child was born alive. In response to Detective Pfaff's leading questions, Heiges recounted that the child cried "under the water" and that she believed that if she "didn't do it [herself] that he was going to do something to her." In subsequent recorded conversations, Heiges gave statements consistent with what she had told A.B. and R.C. prior to the beginning of the police investigation: that she had delivered a live baby girl, held her under water in the bathtub until she drowned, and placed the body in a shoebox, and that the shoebox was later dumped in the garbage chute of her apartment building. The details of the account remained the same from the pre-investigation statements to friends through the statements to the police.

Detective Pfaff interviewed other witnesses, including E.M. Detective Pfaff's investigation included contact with the Dakota County Medical Examiner and officials at the landfill that serviced Heiges's apartment complex, to determine whether the child's remains could be located. He learned that because the body would have been compacted and buried in a large section of landfill, it would be virtually impossible to recover any remains.

Investigations discovered small traces of blood on the floor and walls of the bathroom where Heiges delivered the child. When the blood was tested, it proved to contain a mixture of DNA from three or more individuals. The tests revealed that 75.5% of the general population could be excluded as potential sources of the DNA. Neither Heiges nor E.M. could be excluded as potential sources for the DNA. It was also possible that some of the DNA could have come from the child. However, no further conclusions could be drawn from this evidence.

Heiges was charged with second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (2004), and first-degree manslaughter under Minn.Stat. § 609.20(3) (2004).

Prior to trial, Heiges moved to dismiss the charges on the basis that the state did not have sufficient evidence to corroborate her confessions to Detective Pfaff as required by Minn.Stat. § 634.03 and, therefore, could not show probable cause. The district court denied the motion.

The jury trial commenced in September 2008. A.B. testified that Heiges told him that she had killed the child herself, and that he assumed that the child had been born alive and had lived for some time after birth. He testified that Heiges told him, during the early morning hours of January 1, 2007, that she had drowned her child in the bathtub, and that she confirmed this statement in a subsequent telephone conversation with A.B.

E.M. also testified at trial. He denied any involvement in the child's birth and death, stating that he was not present in the bathroom when Heiges delivered and never saw the child. He testified that Heiges entered their bedroom one night, soaking wet, and said, "It's done, it's done." When he went into the bathroom, he noticed an amount of blood he thought consistent with a miscarriage. Other witnesses, including Heiges's friends and office staff from her apartment, testified to their observations of her pregnancy in early 2005.

During trial, the state first learned about R.C. The district court conducted a one-half day hearing outside the presence of the jury to give the defense the opportunity to investigate and interview R.C. Heiges did not dispute the fact that neither the prosecutor nor the Burnsville Police Department had prior knowledge of R.C. The district court ruled R.C. could testify and gave the defense a two-day continuance in order to fully prepare for her testimony.

When the trial resumed, R.C. testified about her conversation with Heiges prior to the child's birth. R.C. recounted that Heiges said "they were going to go up north somewhere to a cabin or something and have the baby there, and then bury it in the woods." R.C. also testified about a conversation that took place a few days after the child's death in which a distraught Heiges admitted that "they had went through with killing the baby, and she had put it in a shoebox and kept it, and she couldn't find it." R.C. said that Heiges was upset because she could not find the shoebox containing the child's body.

At the close of the state's case and at the conclusion of the trial, Heiges moved the district court for judgment of acquittal based on the lack of evidence corroborating her confessions. *See* Minn. R.Crim. P. 26.03, subd. 17. The district court denied

the motions, finding that the corroborative evidence was sufficient to submit the case to the jury.

The jury found Heiges guilty of second-degree intentional murder but acquitted her on the manslaughter charge. The district court denied Heiges's request for a durational or dispositional departure, and imposed a guidelines sentence of 299 months' imprisonment. This appeal follows.

## ISSUES

I. Were Heiges's confessions to the police sufficiently corroborated as required by Minn.Stat. § 634.03?

II. Did the district court properly instruct the jury as to the burden of proof and the duress element of the manslaughter charge?

III. Did the district court abuse its discretion by permitting R.C. to testify?

IV. Did the district court abuse its discretion by imposing a guidelines sentence?

## ANALYSIS

### I.

■ A defendant's confession is not sufficient to sustain a conviction "without evidence that the offense charged has been committed." Minn.Stat. § 634.03. The statute codifies the common-law doctrine of corpus delicti. This corroboration requirement serves two purposes—discouraging coercively acquired confessions and assuring the reliability of the defendant's admission. *In re Welfare of M.D.S.*, 345 N.W.2d 723, 735 (Minn.1984) (citing *State v. Azzone*, 271 Minn. 166, 170, 135 N.W.2d 488, 493 (1965)).

Heiges argues that her conviction cannot stand because the state failed to present sufficient evidence to corroborate her ad-

missions to Detective Pfaff. Absent her confessions to police, Heiges contends, there is no evidence that she intentionally caused the death of a live human being. To resolve this issue, we review the physical evidence and testimony apart from Heiges's incriminating statements. We also consider whether statements Heiges made to friends after the child's death but prior to the criminal investigation are subject to section 634.03's corroboration requirement and whether such statements may be used to corroborate Heiges's confessions to the police. We turn first to these legal issues.

In *State v. Vaughn*, 361 N.W.2d 54, 56 (Minn.1985), the supreme court defined "confession" as "any statement by a person in which he explicitly or implicitly admits his guilt of a crime." *Vaughn* arose out of a sting operation, during which the defendant admitted to undercover police officers that he was in possession of stolen property. 361 N.W.2d at 56. The supreme court held, without extensive analysis, that Vaughn's statement required corroboration and that the requirement was met. *Id.* at 56–57.

But in *State v. Koskela*, 536 N.W.2d 625 (Minn.1995), the supreme court used post-crime incriminating statements the defendant made to acquaintances prior to a criminal investigation to corroborate his subsequent confession to police. At issue was whether Koskela's confession to police that he entered the victim's home to commit a burglary (the predicate offense to the felony murder conviction) was sufficiently corroborated. *Koskela*, 536 N.W.2d at 629. The state argued that Koskela's admissions to his close friends did not require corroboration because they were given freely and voluntarily prior to his confession to the police. Although the supreme court did not squarely address this argument, the court cited these admissions as evidence that corroborated Koske-

la's later confession to police. *Id.* ("Based on ... the statements and declarations appellant made to other individuals, we conclude that there was sufficient corroborative evidence for a jury to determine that appellant had the intent to commit burglary...."). Implicit in the supreme court's reasoning is the conclusion that the corroboration requirement does not apply to post-crime statements made to friends before the commencement of a criminal investigation.

■ This conclusion is consistent with the rationale behind the long-standing rule that admissions made prior to a criminal act do not require corroboration. *See State v. Smith*, 264 Minn. 307, 313, 119 N.W.2d 838, 843 (1962) (stating a confession refers "only to a direct or implied acknowledgment of guilt, after an offense [was] committed"); *see also State v. Johnson*, 277 Minn. 230, 235, 152 N.W.2d 768, 773 (1967) (stating that a confession is a party's acknowledgment "of his guilt of the crime charged"). The United States Supreme Court articulated the rationale for this rule in *Warszower v. United States*:

> The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone. Where the inconsistent statement was made prior to the crime this danger does not exist. Therefore we are of the view that such admissions do not need to be corroborated. They contain none of the inherent weaknesses of confessions or admissions after the fact.

312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941).

The majority of courts have adopted this rule. *See, e.g., Castillo v. State*, 614 P.2d 756, 759 (Alaska 1980) ("To establish the corpus delicti of murder the state may rely on pre-crime statements of the defen-

dant."); *State v. Johnson,* 821 P.2d 1150, 1162 (Utah 1991) ("A number of federal and state courts addressing this issue have concluded that the corpus delicti rule is inapplicable to statements made prior to or during the commission of a crime."); *State v. Pietrzak,* 110 Wash.App. 670, 41 P.3d 1240, 1245 (2002) ("[S]tatements made by the defendant in the course of a crime are not confessions or post-crime statements requiring corroboration for purposes of corpus delicti."); *see also Smith v. United States,* 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954) (noting in a tax-evasion case, the corpus delicti rule only applies to admissions "made after the fact to an official charged with investigating the possibility of wrongdoing"). The absence of coercive or intimidating circumstances distinguishes pre-crime statements from subsequent confessions to police.

We are also guided by the analysis and decision of the Wisconsin Court of Appeals in *State v. Hauk,* 257 Wis.2d 579, 652 N.W.2d 393 (Wis.Ct.App.2002), *review dismissed* (Wis. Sept. 18, 2002). In *Hauk,* the court considered whether a confession Hauk made to a friend prior to a criminal investigation required corroboration under the common-law corpus delicti rule. 652 N.W.2d at 399. Hauk was charged with violating the terms of her bail after she told a friend of her plan to have two people killed. *Id.* at 396. The only evidence of the bail violation was Hauk's initial statement to her friend, a subsequent statement to the friend that was overheard by a detective, and her later confession to the detective. *Id.* at 399. The state argued that Hauk's statements to her friend did not require corroboration. *Id.* at 399–400. The appellate court agreed, and also held that these statements "provided sufficient evidence to corroborate Hauk's confession to the police." *Id.* at 401.

The *Hauk* court noted the purpose of the corroboration requirement: "the main concern behind the corroboration rule is that an accused will feel coerced or induced when he or she is under the pressure of a police investigation and make a false confession as a result." *Id.* (quotations omitted). The court observed that these concerns do not apply to statements made to friends before a police investigation has begun. *Id.* Without the external pressure of a police investigation, the risk of police coercion or intimidation is not implicated.

■ As in *Hauk,* Heiges made incriminating statements to friends before a criminal investigation was initiated and in the absence of any other coercive or threatening circumstances. The distinction the *Hauk* court drew between such statements and confessions to police is consistent with the express purposes of the corroboration requirement. The concern that a statement is not reliable if it is made under coercion or intimidation is absent here, and the desire to discourage inappropriate police tactics is not implicated. Accordingly, we conclude that statements made to friends or acquaintances prior to the commencement of a police investigation need not be corroborated and may be used to corroborate a defendant's later confession to police.

■ We now consider whether the evidence here, including Heiges's statements to friends prior to the commencement of the criminal investigation, sufficiently corroborate her later confessions to Detective Pfaff as required by section 634.03. In April 2005, Heiges admitted to R.C. that she was pregnant and that she intended to deliver the child up north, kill it, and bury the body in the woods. Because this pre-crime statement does not require corroboration, it may be used to corroborate Heiges's post-crime confessions to police. *See Smith,* 264 Minn. at 313, 119 N.W.2d at 843.

■ Heiges's post-crime statements provide additional corroboration. Within days of the crime, Heiges confessed to R.C. that she had the child, drowned it in her bathtub, and placed the body in a shoebox. Heiges's detailed account of the child's birth and death to A.B. on New Year's Day 2007, and her verification of the events in a later telephone conversation with A.B., provide similar corroboration.

Heiges's statements to R.C. and A.B. are consistent and, like those in *Koskela* and *Hauk*, were not the product of police coercion or intimidation. They corroborate the essential elements of her later confession to the police: she delivered and drowned the child in her apartment bathtub in early May 2005, and the body was eventually dumped in a garbage chute. These pre-investigation statements to friends make Heiges's confession sufficiently reliable that a jury could reasonably conclude that she committed the crime.

■ There is also circumstantial evidence that corroborates aspects of Heiges's confessions to police. *See, e.g., M.D.S.*, 345 N.W.2d at 735–36 (circumstantial evidence corroborating confession included defendant bringing in newspaper clipping describing shooting, witness description of car similar to defendant, defendant possessed gun of same caliber as the one used in the commission of the offense). Heiges's efforts to conceal her pregnancy and her failure to obtain any prenatal care are consistent with her expressed intention to make sure that the baby did not live. E.M.'s testimony regarding the blood in the bathtub corroborates the approximate date and specific location Heiges indicated in her confessions. And the DNA evidence, while inconclusive, lends some credence to her confessions.

Heiges contends that the state could not prove that the child was born alive and obtained a separate and independent existence from her mother. *See State v. Soto*, 378 N.W.2d 625, 630 (Minn.1985) (holding that the vehicular homicide statute's definition of "human being" does not include a viable fetus); *State v. Kinsky*, 348 N.W.2d 319, 324–25 (Minn.1984) (affirming a murder conviction where evidence established that infant was "born alive and had an independent and separate existence from its mother"); *but see Boyd v. Minnesota*, 274 F.3d 497, 501 n. 4 (8th Cir.2001) (noting that supreme court has never formally adopted a "born alive" rule). Heiges relies on the facts that the child's body was never recovered and the lack of physical evidence indicating that the child was born alive. This reliance is misplaced.

■ The evidence needed to corroborate a confession to police is not required to address every element of the charged offense. Rather, the elements of the offense may be " 'sufficiently substantiated by independent evidence of attending facts or circumstances from which the jury may infer the trustworthiness of the confession.' " *M.D.S.*, 345 N.W.2d at 735 (quoting *Smoot v. United States*, 312 F.2d 881, 885 (D.C.Cir.1962)). The state's task is to "bolster the confession by independent evidence of trustworthiness." *Id.* (citing *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954)); *see also State v. Brant*, 436 N.W.2d 468, 471 (Minn.App.1989) (holding that the critical inquiry is the "practical relation between the confession and the government's case, rather than the theoretical relation to the definition of the offense."). When the corroborative evidence shows that the confession is generally trustworthy, the defendant's confession to police may, in and of itself, provide the final element to support the conviction. *See Smith*, 348 U.S. at

156, 75 S.Ct. at 199 ("All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offenses 'through' the statements of the accused.").

■ We conclude that the corroborative evidence is sufficient to bolster Heiges's confessions to police and ensure their reliability. It is undisputed that Heiges was pregnant and near full-term on the day of the child's birth. Heiges told R.C., during the previous month, of the plan to kill the child. Heiges's admissions to R.C. and A.B. after the child's death are consistent and indicate that Heiges acted according to her plan. E.M.'s testimony and the DNA evidence support a finding that the child died in the apartment bathtub. This evidence, along with Heiges's multiple confessions to police, establish the elements of second-degree murder.[1]

## II.

Heiges challenges the district court's jury instructions, arguing that (1) the district court did not properly instruct the jury that it needed to find the death of a live infant in order to convict, and (2) the district court did not properly instruct the jury on the duress element of the manslaughter charge.

■ The district court is afforded "considerable latitude" in fashioning jury instructions. *State v. Baird,* 654 N.W.2d 105, 113 (Minn.2002). We review instruc-

tions "in their entirety to determine whether they fairly and adequately explained the law of the case." *State v. Flores,* 418 N.W.2d 150, 155 (Minn.1988). The refusal to give a requested jury instruction lies within the discretion of the district court and will not be reversed absent an abuse of discretion. *State v. Cole,* 542 N.W.2d 43, 50 (Minn.1996). We focus our analysis on whether the refusal resulted in error. *State v. Kuhnau,* 622 N.W.2d 552, 555 (Minn.2001).

■ Heiges requested that the jury be instructed on the first element of both charges as follows:

> In this case, there is a separate element of each of these offenses which you must determine, and that is whether the state has proven that a human being was born to Ms. Heiges on May 5, 2005. Where the human being alleged to have been killed is a newborn, the state is required to prove beyond a reasonable doubt that the infant was born alive. To be born alive means that the infant attained a separate and independent existence from its mother.

The district court modified the standard jury instruction for second-degree murder to specify that "the death of a live human being, a newborn infant, must be proven" in order to return a guilty verdict. The district court added this same language to the first-degree manslaughter instruction. Because the instructions advised the jury that it must find the death of a live human being, they properly state the law. The

---

1. At oral argument, Heiges contended that Minn.Stat. § 634.051 (2008) presents another basis for reversing her conviction. We disagree. The statute provides that "[n]o person shall be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of killing by the defendant, as alleged, are each established as independent facts beyond a reasonable doubt." Minn.Stat. § 634.051. This statute

restates the prosecution's burden of proof in every homicide case: to establish (1) the death of the victim and (2) the fact of the killing by the defendant. *Id.* Because the evidence at trial, including Heiges's confessions, was sufficient to establish, beyond a reasonable doubt, the child's live birth, its death, and Heiges's culpability, this argument is unavailing.

district court did not abuse its discretion in declining to give Heiges's proposed instruction.

■ Heiges next argues that the district court erred in instructing the jury on the manslaughter charge. Specifically, she asserts that the manslaughter instruction deprived her of a fair trial because it did not permit the jury "to consider whether Heiges, if she intentionally caused the death of her newborn, acted under duress by [E.M.]." We disagree.

■ We first note that Heiges did not raise this issue before the district court, so we review the instruction given for plain error. *See State v. Jackson,* 714 N.W.2d 681, 690 (Minn.2006) ("[T]his court has discretion to consider an error not objected to at trial if it is plain error affecting substantial rights."). Plain error may only be found in jury instructions "if the instructions were misleading or confusing on fundamental points of law." *State v. Ihle,* 640 N.W.2d 910, 916 (Minn.2002).

The district court instructed the jury on the duress element of the manslaughter charge:

> Fourth, [Heiges] participated in the crime because she was coerced by threats made by someone who is not her co-conspirator, which caused her to reasonably believe that her act was the only means of preventing imminent death to herself. If you find that [E.M.] is a co-conspirator of [Heiges], [Heiges] is not guilty of manslaughter in the first degree.

Heiges does not assert that the instruction misstates the law. Rather, she argues the instruction was misleading because the district court did not permit witnesses other than Heiges to testify about their fear of E.M.[2] We disagree. The instruction

tracks the language of Minn.Stat. § 609.20(3) and Heiges was permitted to and did present evidence demonstrating that she feared and was threatened by E.M. The jury was properly assigned the task of determining whether Heiges acted because E.M. threatened her with imminent death. Because the manslaughter instruction conforms with the law, including Heiges's theory of duress, we conclude that the jury instructions do not constitute plain error.

### III.

■ Heiges challenges the district court's admission of R.C.'s testimony on the ground that the state failed to disclose her identity prior to trial. Evidentiary rulings rest within the sound discretion of the district court and will not be reversed absent a clear abuse of discretion and prejudice to the defendant. *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003). Heiges argues that the state's failure to comply with the disclosure requirements of Minn. R.Crim. P. 9.01 should have precluded R.C.'s testimony. *See* Minn. R.Crim. P. 9.01 (prosecutor has duty to disclose all discoverable information to defense prior to omnibus hearing). Heiges bases this argument on the doctrine of collective knowledge—that facts known by one police officer are imputed to another. *See State v. Riley,* 568 N.W.2d 518, 523 (Minn.1997) (applying collective-knowledge doctrine); *see also Morelli v. Webster,* 552 F.3d 12, 17 (1st Cir.2009) ("[T]he collective knowledge doctrine[ ] is a mechanism that in some circumstances allows a court to 'impute' facts known by one police officer to another police officer engaged in a joint mission."). We disagree.

It is undisputed that, prior to trial, only Heiges and the Eagan Police Department

---

2. The district court excluded that testimony as inadmissible character evidence. *See* Minn. R. Evid. 404(a) ("Evidence of a person's char-

acter or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.").

knew of R.C. as a potential trial witness. At the time R.C. made her report, the Eagan Police Department had no way of sharing such information with the Burnsville Police Department. Heiges argues that because the Burnsville and Eagan Police Departments are both Minnesota law-enforcement agencies, the collective-knowledge doctrine should be extended to them. Heiges cites no authority to support extending the doctrine so far. *But see Morelli,* 552 F.3d at 17 (applying collective knowledge only when officers engaged in "a joint mission"); *Riley,* 568 N.W.2d at 523 (applying collective knowledge only in the context of a single, coordinated investigation). On this record, we conclude that the district court did not abuse its discretion by permitting R.C. to testify at trial.

## IV.

 Finally, Heiges asserts that the district court abused its discretion in imposing a guidelines sentence. District courts have broad discretion in sentencing. *State v. Daniels,* 765 N.W.2d 645, 651 (Minn.App.2009), *review denied* (Minn. Aug. 11, 2009). The sentencing range provided by the Minnesota Sentencing Guidelines is "presumed to be appropriate" unless "identifiable, substantial, and compelling circumstances" support departure. Minn. Sent. Guidelines II.D (2008); *see also State v. Givens,* 544 N.W.2d 774, 776 (Minn.1996) ("[T]he presumptive sentence should be imposed, unless the circumstances of the crime indicate that a departure is warranted."). Reversal based on the district court's refusal to depart from the presumptive sentence is rarely warranted. *State v. Kindem,* 313 N.W.2d 6, 7 (Minn.1981).

The record demonstrates that the district court took great care and devoted considerable time to determining the appropriate sentence. The district court considered the various mitigating factors, including the rarity of neonaticide, the domestic abuse Heiges sustained, Heiges's mental condition at the time of the offense, and her amenability to probation. *See State v. Trog,* 323 N.W.2d 28, 31 (Minn. 1982) (noting factors such as defendant's age, remorse, and support of friends and family as factors justifying dispositional departure). The district court also examined the aggravating factors, including the testimony that Heiges tried to induce a miscarriage, her plan to deliver the child up north and bury the body there, and the disposal of the child's body in a landfill. Our careful review of the record in this serious, troubling case demonstrates that the district court carefully considered all relevant factors in sentencing Heiges and that this is not one of those rare cases warranting reversal of a presumptive sentence.

## DECISION

Heiges's statements to her friends, made prior to her confessions to police are not subject to the corroboration requirements of Minn.Stat. § 634.03. These statements, coupled with other evidence, are sufficient to corroborate Heiges's confessions to police. And because the district court did not abuse its discretion with respect to the jury instructions, evidentiary issues, or sentencing, we affirm.

**Affirmed.**

RANDALL, Judge (dissenting).*

Appellant's conviction is not supported by sufficient evidence to prove the corpus

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

delicti under the relevant statutory provisions and caselaw. I dissent from the majority opinion affirming the conviction and would reverse for lack of evidence.

Appellant "confessed" to A.B. and ultimately confessed to police, after lengthy and leading questioning, that she and E.M. held the infant Sydney under water, preventing her from breathing. There was little evidence apart from these statements to prove the corpus delicti—the death of a live-born child who could be considered a "human being." *See generally* Minn.Stat. § 609.19, subd. 1(1) (2004) (defining second-degree murder to require the death of a "human being"); *State v. Soto,* 378 N.W.2d 625, 629–30 (Minn.1985) (rejecting argument that term "human being" in homicide statutes includes viable fetus).

The majority concludes that there was sufficient evidence of the corpus delicti under Minn.Stat. § 634.03, which requires that a defendant's confession be corroborated by independent evidence of the corpus delicti. There was evidence that appellant had stated to R.C. her "intention" to kill her baby, if born alive. I suggest future speculation does not support a murder conviction when there is no body, no solid proof of a body (baby) being born alive, and no solid proof that if there was a birth, that the baby (body) was not stillborn. DNA evidence from blood found at the scene could not exclude one of the contributors being a child of appellant and E.M. But so what. The "exclusion" was that 75% of the population could be excluded, but 25% of the population could not. Is that 25% of the people in Minnesota, about 1.3 million, or 25% of the population of the metro area, about 600,000? In paternity cases, where blood work is vital, the statute calls for 99% before a presumption arises, and a presumption is never proof beyond a reasonable doubt. *See* Minn.Stat. § 257.62, subd. 5(b) (2008) (establishing evidentiary presumption of paternity at 99% probability based on blood or genetic tests). The majority concludes that there was other corroboration in appellant's later admissions to people other than police officers. I disagree. A confession may not be used to corroborate another confession under Minn.Stat. § 634.03 merely because it was not made to police. In the similar situation of accomplice testimony, in which the legislature has specified that accomplice testimony must be corroborated by other evidence in order to support a conviction, the corroboration may not come from another accomplice's testimony. Minn.Stat. § 634.04 (2008); *State v. Harris,* 405 N.W.2d 224, 227 (Minn.1987); *State v. Her,* 668 N.W.2d 924, 927 (Minn.App.2003), *review denied* (Minn. Dec. 16, 2003). The same basic principle that evidence whose sufficiency is suspect should not be corroborated by evidence of the same suspect form should apply here. The confession-corroboration statute, Minn.Stat. § 634.03, and the accomplice-corroboration statute, Minn.Stat. § 634.04, should be read consistently in this regard. *See State v. Herbert,* 601 N.W.2d 210, 213 (Minn.App.1999) (stating that statutes having common purpose should be construed in light of each other).

The majority itself cites *State v. Vaughn,* 361 N.W.2d 54, 56 (Minn.1985), for the proposition that a "confession" is "any statement by a person in which he explicitly or implicitly admits his guilt of a crime." I agree. Appellant's "statements/confessions," before and after whatever happened, were used extensively by the state at trial, and extensively in its appellate brief, as a plain old confession of guilt by appellant. The state pounds on them. If these statements to others, not police, were not "confessions," under the rules of evidence they would not even be relevant. Minn. R. Evid. 403. Of course the state used them as confessions. Therefore, Minn.Stat. § 634.03 is in play.

A defendant cannot be convicted by an uncorroborated confession, and other uncorroborated confessions cannot corroborate what the state might consider the "chief confession."

A statement to a person who is not a police officer is just as much a "confession" as a statement to a person concealing his status as an officer. To ignore that is to ignore the Constitution and seek only an outcome.

The majority relies on *State v. Koskela,* 536 N.W.2d 625 (Minn.1995), to justify the use of appellant's other statements to corroborate her confession to police. But in *Koskela,* the supreme court discussed the role of such other statements without analyzing whether it was permissible to consider them. *Id.* at 629. Without that analysis, *Koskela* does not provide precedent for using appellant's other statements as corroboration under Minn.Stat. § 634.03. *See generally State v. Thoma,* 569 N.W.2d 205, 207 (Minn.App.) (declining to consider opinion deciding appeal without discussing jurisdictional basis for the appeal as being precedential on the jurisdictional issue), *aff'd mem.,* 571 N.W.2d 773 (Minn.1997). And, significantly, there is no attempt in *Koskela* to distinguish *Vaughn* and its broad definition of "confession."

The majority suggests a rule that would not require corroboration of post-crime statements made to friends before the commencement of a police investigation. Minn.Stat. § 634.03 does not include such a limitation. *See generally State v. Hulst,* 510 N.W.2d 262, 264 (Minn.App.1994) (noting that this court may not supply statutory language that the legislature has omitted or overlooked). The purpose behind the confession-corroboration rule goes beyond a concern with police coercion. *See In re Welfare of M.D.S.,* 345 N.W.2d 723, 735 (Minn.1984) (stating one purpose of the rule is to ensure the defendant's admission is reliable).

The majority relies heavily on a Wisconsin decision adopting such a post-crime, pre-investigation admissions exception. *See State v. Hauk,* 257 Wis.2d 579, 652 N.W.2d 393 (Wis.Ct.App.2002), *review dismissed* (Wis. Sept. 18, 2002). But *Hauk* applies a Wisconsin common-law rule, not embodied in a statute, and it transforms the "main concern" of that rule with police coercion into the only concern, since it exempts admissions made to private individuals. *See id.* at 399–401. As indicated in *M.D.S.,* the purpose of the Minnesota statute is broader. And if the statute were not also concerned with defendants manufacturing fictional crimes, why would the corroboration it requires be "evidence that the offense charged has been committed"? Minn.Stat. § 634.03.

But even if the statements to others were sufficient to corroborate appellant's confessions under Minn.Stat. § 634.03, they still were not sufficient to prove that the child was "born alive" and attained a separate and independent existence, under *Soto* and *State v. Kinsky,* 348 N.W.2d 319, 324–25 (Minn.1984). The corpus delicti statute applicable to homicide offenses, Minn.Stat. § 634.051 (2008), provides support for this conclusion, and thus the need for a directed verdict for defendant.

Appellant's statement of an intention *at some time in the future* to kill her baby (if it survived childbirth) does not provide evidence of a live birth. The DNA evidence is consistent with a miscarriage as well as a live birth (and that evidence is colored by the weak 25%/75% inclusion). Even assuming, which I do not concede, that Minn.Stat. § 634.03 is satisfied, that statute merely describes the required proof of corpus delicti in all criminal offenses. Prosecutions for murder, and particularly alleged infanticide, *present differ-*

ent problems of proof than other criminal cases. With alleged infanticide there is the possibility of miscarriage. Appellant argues that there are no American cases of infanticide being proven without the victim's body. *See generally* Peter G. Guthrie, Annotation, *Proof of Live Birth in Prosecution for Killing Newborn Child,* 65 A.L.R.3d 413 (1975 & Supp.2009) (collecting cases). Recovery of a body is not required to prove the corpus delicti for homicide in Minnesota (but it is ignorance to ignore the benefit to the state to have a body, and its weakened case when it does not). *See* 1981 Minn. Laws ch. 147, § 1 (deleting language requiring that the death of the victim be proven by "direct proof"). Without a body, the state's case is always weaker, and remaining evidence has to be satisfied against the constitutional standard of "proof beyond a reasonable doubt."

Although corpus delicti may be proven without the infant's body, the supreme court has strongly implied that there must be evidence that the child was "born alive" and had a separate and independent existence apart from its mother. The court in *Soto,* in rejecting the argument that a viable fetus was a "human being" for purposes of the homicide statutes, cited with approval cases from other jurisdictions adopting the "born alive" rule. *Soto,* 378 N.W.2d at 628–30. And earlier, the court in *Kinsky* had applied the "born alive" rule, although without explicitly stating that it was the law in Minnesota. 348 N.W.2d at 324–25. The *Kinsky* court also applied authority from other jurisdictions holding that "the state must prove that the infant ... had an independent and separate existence from its mother." *Id.* (quotation and citations omitted). Neither *Soto* nor *Kinsky* explicitly adopted the

"born alive" rule. *See Boyd v. Minn.,* 274 F.3d 497, 501 n. 4 (8th Cir.2001). But the court in both cases strongly hinted at its acceptance of the rule.

Even if *Soto* and *Kinsky* have not categorically adopted the "born alive" rule, I do not see how the corpus delicti requirement for a homicide prosecution involving a newborn could be met without proving the fetus was "born alive." Given the risks of childbirth, particularly an unattended birth, and the possibility of miscarriage, the corpus delicti in a charge of homicide of a newborn cannot, under Minn.Stat. § 634.051, be proven without proof beyond a reasonable doubt that the infant was born alive.

Minn.Stat. § 634.051 [1] provides that:

No person shall be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of killing by the defendant, as alleged, *are each established as independent facts* beyond a reasonable doubt.

(Emphasis added.) This statute, which was adopted from the New York Penal Code in 1885 and has been amended only once since then, codifies the common-law requirement of corpus delicti in homicide cases. *See Baker v. Ploetz,* 616 N.W.2d 263, 270 (Minn.2000) (noting enactment of New York Penal Code in 1885); Minn. Gen.Stat. tit. 9, ch. 2, § 150 (1889) (first appearance of the provision in Minnesota statutes); 1981 Minn. Laws ch. 147, § 1, at 453 (deleting language requiring that fact of death be established by "direct proof" and only defendant's responsibility need be established by proof beyond a reasonable doubt).

Minn.Stat. § 634.051 can only be read as requiring that, in homicide cases, the cor-

---

1. The parties have not cited Minn.Stat. § 634.051. But this court has an obligation to decide cases in accordance with applicable law. *State v. Hannuksela,* 452 N.W.2d 668, 673 n. 7 (Minn.1990). Minn.Stat. § 634.051 is closely associated with Minn.Stat. § 634.03, and plainly bears on the corpus delicti issue.

pus delicti—the death of the alleged victim—be proven beyond a reasonable doubt by evidence *independent* of the evidence proving the defendant's responsibility. Since the defendant's confession is evidence proving her responsibility, it follows that the death of the alleged victim must be proven by evidence independent of that confession, and must be proven by that other evidence *beyond a reasonable doubt,* not merely shown to "some degree" by other evidence, sufficient to satisfy Minn. Stat. § 634.03. That higher standard of proof was not met in this case.

This construction of Minn.Stat. § 634.051 is the only reasonable interpretation of that provision. The statute is poorly written because proof of "the fact of killing by the defendant" necessarily implies a "killing," i.e. a felonious death of the victim. But the statute is completely superfluous unless it is read to require that the proof of the "death of the person alleged to have been killed" be separate from the proof of "the fact of killing by the defendant." The fact of "the death of a human being" is an element of second-degree murder, which must, therefore, necessarily be proved beyond a reasonable doubt. Minn.Stat. § 609.19, subd. 1(1). And the criminal agency of the defendant in causing that death is also, obviously, an element to be proved beyond a reasonable doubt. It would be completely unnecessary to restate these two elements in Minn.Stat. § 634.051. *See generally Urban v. Am. Legion Dep't of Minn.,* 723 N.W.2d 1, 5 (Minn.2006) (recognizing presumption that no statutory language should be deemed superfluous). Thus, the statute must be read as specifying *the manner* in which those elements are to be proved— that the corpus delicti is to be proven separately from the defendant's confession or other evidence of the defendant's responsibility, and that that separate proof must be proof beyond a reasonable doubt.

Section 634.051 has obscure origins. *See People v. Lipsky,* 57 N.Y.2d 560, 457 N.Y.S.2d 451, 443 N.E.2d 925, 930 (1982) (interpreting language in New York statute, removed from Minnesota statute in 1981, requiring "direct proof" of victim's death). But the statute was plainly intended to impose a burden on the state *beyond* that imposed by the homicide statutes themselves, or by Minn.Stat. § 634.03, the general confession-corroboration statute, and it should be read with that intent in mind.

This stricter corpus delicti requirement for homicides is justified by the more serious penalties attached to homicide. The "corpus delicti rule" was developed in response to erroneous confessions to homicides, particularly in cases in which the alleged victim reappeared, to the court's embarrassment, after the confessing defendant had been executed. *See* Note, *Confession Corroboration in New York: A Replacement for the Corpus Delicti Rule,* 46 Fordham L.Rev. 1205, 1208 (1978).

The independent evidence of the corpus delicti here—the death of a live-born baby—falls far short of proof beyond a reasonable doubt. As discussed above, only appellant's stated intention to commit such an act and the DNA evidence establishing the *possible* presence of fetal blood, possibly connected to defendant, provided evidence independent of appellant's confessions to prove that a child was born live and then died. The other evidence cited by the district court—the evidence of appellant's pregnancy and E.M.'s description of the incident, which was consistent with a miscarriage—merely establishes that the corpus delicti was *possible.*

The humanity of the law, as reflected in Minn.Stat. § 634.051, as well as *Soto* and *Kinsky,* requires this result. The corpus delicti rule recognizes the risk of false confessions and states that it is unaccepta-

ble to base a criminal conviction solely on the defendant's confession. *In re Welfare of C.M.A.*, 671 N.W.2d 597, 601 (Minn.App. 2003). Here, we must also consider the perceptions of a woman impregnated by an abusive boyfriend eager for the pregnancy to come to a bad end, and who had gone through labor, allegedly, and lost her child, whether by miscarriage or by a wrongful act, entailing grief or guilt or both. *See Opper v. United States*, 348 U.S. 84, 89–90, 75 S.Ct. 158, 162, 99 L.Ed. 101 (1954) (noting extent of confession-corroboration requirements is based in part on recognition that "the self-interest of the accomplice" and "the aberration or weakness of the accused under the strain of suspicion" affect the reliability of confessions). A criminal conviction for the serious offense of second-degree murder cannot rest on the confession of a person in such circumstances without independent proof beyond a reasonable doubt of the live birth and subsequent death of the infant.[2]

This record falls far short of providing that proof. Appellant's conviction should be reversed.

---

2. This analysis finds support in the case of Leslie Berg, who confessed to infanticide initially in chemical-dependency treatment and later to police. *Berg v. State*, 557 N.W.2d 593, 594 (Minn.App.1996). Although the infant's body was never found, counsel encouraged Berg to plead guilty. *Id.* The district court ultimately granted postconviction relief, in part because Berg's attorney did not tell her of the state's lack of physical evidence to corroborate her confessions. *State v. Berg*, No. C7–97–795, 1997 WL 639413, at *2 (Minn.App. Oct.14, 1997).