STATE of Minnesota, Respondent,

v.

Eric William KOSKELA, Appellant.

No. C6–94–1373.

Supreme Court of Minnesota.

Sept. 1, 1995.

Charlann Elizabeth Winking, Asst. State Public Defender, Minneapolis, for appellant.

J. Michael Richardson, Asst. County Atty., Minneapolis, and Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

## OPINION

STRINGER, Justice.

Appellant, Eric William Koskela, was convicted of first-degree burglary in violation of Minn.Stat. § 609.582, subd. 1 (1994) and first-degree felony murder in violation of Minn.Stat. § 609.185(3) (1994). Appellant was sentenced to life in prison for first-degree felony murder and to a concurrent sentence of 21 months for first-degree burglary. Appellant appeals from the judgment of conviction. We affirm appellant's convictions.

On August 5, 1990, the victim was found dead in her apartment at LouAnn Terrace in Crystal, Minnesota. On that day, the tenants in the apartment below the victim contacted the apartment manager when they noticed that water was dripping from the ceiling into their bedroom. The manager went to the victim's apartment, and when no one responded to his knocks, he entered the apartment using his passkey. Upon entering, he walked toward the bedroom, where he noticed that the waterbed was leaking onto the floor. As he walked further into the room, he discovered the victim's body and called the police.

When Lieutenant Richard Gautsch of the Crystal Police Department came to the scene, he noted that the balcony door to the victim's apartment was open. The victim was found lying in her waterbed, wearing only underpants, with a comforter partially covering her body. A Rogers brand knife was found protruding from her chest, and a toaster cover was found partially wrapped around the knife. Both objects appeared to be from the victim's kitchen, as an uncovered toaster and a knife holder for Rogers brand knives, with one knife missing, were found there. Lieutenant Gautsch testified that no items were found to be missing from the apartment; there was no evidence of any ransacking; no fingerprints were found on the knife or on the bed frame; no semen was found in the victim's body, indicating that there had not been a sexual assault; and while some of the blood that was found on the scene and later sampled was determined to be from the victim, other samples could only be determined to be of human origin.

The lab technician from the Hennepin County Crime Lab described the crime scene as relatively clean, with few blood stains. Small spots of blood were found on the wall near the bed and on the television located at the foot of the bed. The technician testified that the blood splatter had been inhibited because the toaster cover was partially around the knife and the victim was stabbed through her comforter. The technician testified that because of the toaster cover and the stabbing through the comforter, very little blood would be found on the assailant.

The Hennepin County Medical Examiner identified a total of 39 stab wounds on the victim's arms, legs, chest, back, and groin area. A large 2 1/2 inch long stab wound was found in the upper front chest area leading into the vertebral column through the lung. The medical examiner testified that this wound alone would have been fatal without immediate medical attention and is referred to as a "sucking chest wound" be-

cause the lung attempts to draw air, creating a sucking, gurgling sound. While the wound could interfere with the vocal process, making it difficult to scream, the majority of victims could still make some type of sound. The medical examiner opined the time of death to be between 2:00 and 7:00 a.m. on August 5, 1990.

The victim's boyfriend was immediately identified as a suspect. Prior to her murder, the victim spent the evening with her friend, Kathy Dokken, at Dokken's apartment after plans with her boyfriend did not work out. The victim had been upset with her boyfriend and told Dokken she was thinking of breaking up with him. The victim left Dokken's home, and at approximately 1:20 a.m., the victim called Dokken to let her know that she had arrived home safely. Dokken had another phone call and asked the victim to call her back, which she did at approximately 1:45 a.m. During the conversation, the victim told Dokken that her boyfriend was in the apartment, and the victim and Dokken ended the conversation. At approximately 2:39 a.m., Dokken received another call from the victim, who was by then in good spirits, and based on their conversation, Dokken was under the impression that her boyfriend was no longer in the apartment.

A warrant was obtained to search the house and auto of the victim's boyfriend on August 5, 1990, the afternoon the body was found. He testified that he entered the victim's apartment with a key that she had given him. The apartment was stuffy so he unlocked and opened the balcony door. He fell asleep on the victim's bed while waiting for her to return. He awoke to the victim's voice on the phone, the two talked and argued for a short period of time after which he left the victim's apartment and arrived home at approximately 2:00 or 2:30 a.m. In September 1992, a grand jury was convened to investigate, but no charges were not pursued.

Appellant was first identified as a suspect on April 9, 1993, almost three years after the murder, when a woman contacted the police with information that her ex-boyfriend, Alan Gould, told her that appellant had climbed up a balcony and stabbed and murdered "Nickki" in an apartment at LouAnn Terrace in Crystal, Minnesota.[1]

When Lieutenant Gautsch and Detective Robert Salitros later interviewed Gould, he revealed what appellant had told him about the murder. Thereafter, Gould made two phone calls to appellant and he allowed the officers to record the conversations. During the first call, Gould told appellant that two police officers had come to his place of work to talk about "that girl at LouAnn Terrace." At first, appellant said that he did not know what Gould was talking about, but about an hour later, during the second conversation, appellant stated that if there was any evidence of his culpability, it would have already been found by the police. Appellant also stated that there was "no way they can really prove anything" and that he simply "got lucky." Appellant told Gould that Monica Smit also knew about what had happened.

Shortly thereafter, officers obtained a search warrant for appellant's apartment, but found nothing. The officers took appellant to the squad car. In the car, appellant stated, "don't worry, I'm going to admit everything." On the way to the station, Detective Salitros advised appellant of his Miranda rights, and thereafter, appellant made a general statement as to the facts surrounding the murder.

At the station, a tape-recorded statement was taken from appellant. Appellant stated that he had been drinking and partying in his apartment in the early morning hours on the date of the murder. After everyone was asleep, appellant jumped off of his balcony, and without knowing why, walked toward the victim's apartment, jumped onto her balcony, and entered the apartment through the unlocked balcony door. Appellant stated that once in the apartment, he grabbed a knife from a wooden knife holder in the kitchen and started looking around. He entered the bedroom, where he saw the victim sleeping and stabbed her in the chest, in the area of her breasts. Appellant described how the blankets were covering her at first, but after he started stabbing her, he noticed she was

1. The victim's first name was Nicole.

not wearing a shirt or bra. He estimated that he stabbed her 8 to 12 times and guessed the time he entered her apartment to be around 5:00 or 6:00 a.m. Appellant stated that although the victim had struggled a little bit, he was not aware of any noises made during the stabbing.

After the killing, appellant jumped off of the victim's balcony and went back to his apartment. He threw the shirt he was wearing in the garbage because there were small speckles of blood on it. Appellant stated that since he did not burglarize or rob the victim, he did not think that was the reason he entered her apartment. When he woke up later that morning, he thought the stabbing had been a dream.

At the trial, three individuals, Nils Peterson, Alan Gould, and Monica Smit, each testified that appellant told them how he had killed the victim by stabbing her to death in her apartment. Nils Peterson testified that appellant told him about the murder one evening in early January 1991. The men had taken LSD, and as they sat together, appellant told Peterson that he had jumped off of his balcony, walked over and jumped onto the neighboring balcony, and entered the apartment of the victim through the unlocked sliding door. Peterson testified that appellant stated that he entered the apartment with the intent to steal, but heard a noise on the couch that frightened him, so he grabbed a knife and stabbed the person on the couch. Appellant described to Peterson how he could hear air coming out of the holes in her chest. Appellant told Peterson that he had not been wearing gloves and was surprised that the police had not caught him. Later, when the two were not under the influence of drugs, Peterson asked appellant if what he had told him that night had been the truth, and appellant answered affirmatively. Peterson never contacted the police.

Alan Gould testified that he met appellant in the fall of 1990. Sometime during the following winter, appellant told Gould that he had climbed onto a balcony at LouAnn Terrace, took a knife from the apartment, and stabbed a woman. He told Gould that he did not know why he had done it, and when it was over, it was almost as if he had been dreaming. Appellant stated that he did not feel remorseful about committing the crime, but felt guilty about his lack of remorse. Gould did not believe appellant until appellant produced a newspaper article reporting the death. Appellant then informed Gould that the only other person who knew about the murder was Nils Peterson. Appellant and Gould later became roommates and lived at LouAnn Terrace for a short time. During the summer of 1992, Gould saw a flier with the victim's picture posted at LouAnn Terrace. He told appellant about the flier, but appellant stated that he was not concerned because the police had not found any of his fingerprints. Although Gould occasionally threatened appellant that he was going to tell the police, he never did.

Monica Smit testified that she met appellant in June of 1989, and on the date of the murder, August 5, 1990, appellant was living at LouAnn Terrace with her and Aaron Smit. About four weeks before his arrest, appellant told Monica Smit that he had killed the victim—he said he thought he went into the apartment to rob the victim,[2] and described how he jumped up on the balcony, entered the victim's apartment, heard the victim breathing, panicked, and stabbed her. Monica Smit also did not report what she knew to the police.[3]

Eileen Kluess, the victim's downstairs neighbor, testified that she heard what she thought was the sound of male and female voices arguing in the early morning hours on August 5, 1990, and then shortly after that, she heard a loud thud.[4] Her husband, Meredith Kluess, testified that he was awakened by what sounded like shuffling feet or run-

---

2. On cross-examination, Monica Smit admitted that she could not recall whether appellant had actually said robbery was his intent for entering or whether she heard the remark elsewhere.

3. Shortly before his arrest, appellant and Monica Smit became romantically involved.

4. During cross-examination, she acknowledged that it was possible that the sounds she heard could have come from a slumber party that was going on in the party room across the hall from her apartment.

ning coming from the victim's apartment at approximately 6:15 a.m.

■ Appellant's first claim is that the state failed to prove beyond a reasonable doubt the elements of burglary in the first degree pursuant to Minn.Stat. § 609.582, subd. 1.[5] Appellant claims that other than his uncorroborated confessions to others, there was no evidence that he possessed the necessary specific intent to commit burglary and that his confessions alone are insufficient to sustain his conviction.

■ A confession by a defendant is not sufficient to sustain a conviction without evidence that the offense charged has been committed. Minn.Stat. § 634.03 (1994). In a burglary case, this court has held that it is not necessary for the state to prove that anything actually was taken from the premises in order to meet its burden of proof—the critical point is the defendant's intentions. *State v. Hall,* 286 Minn. 424, 176 N.W.2d 254, 258 (1970).

Evidence of the necessary intent is clearly supplied by the testimony of both Nils Peterson and Monica Smit, who stated that appellant told them that he entered the apartment with the intent to rob the victim. Further, the fact that appellant entered the victim's dwelling by leaping onto the victim's balcony at approximately 6:00 a.m. could lead a jury to reasonably conclude that appellant entered the dwelling with the intent to commit burglary. Based on the circumstances surrounding the offense, the manner and time of entry, and the statements and declarations appellant made to other individuals, we conclude that there was sufficient corroborative evidence for a jury to determine that appellant had the intent to commit burglary when he entered the victim's apartment.

■ Appellant does not challenge the sufficiency of the evidence to sustain the jury's conclusion that he murdered the victim. Because we conclude that the evidence is suffi-cient to sustain the burglary conviction, the felony murder rule applies, Minn.Stat. § 609.185(3), and the conviction for first-degree murder can also be sustained.

■ Appellant next claims that he was denied his constitutional right to a fair trial because the trial court excluded the expert testimony of Dr. Owen Nelson, a clinical psychologist, regarding a psychological disorder that appellant claims affected the reliability of his confessions. In evidentiary matters such as this, we defer to the trial court's exercise of discretion in the conduct of the trial, and we will not lightly overturn a trial court's evidentiary ruling. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). Admission of an expert's opinion testimony generally rests within the sound discretion of the trial court and will not be reversed unless there is clear error. *State v. Myers,* 359 N.W.2d 604, 609 (Minn.1984). The ultimate question of admissibility is whether the expert testimony will assist the jury in resolving the factual questions presented. Minn. R. Evid. 702. The trial court may take into account whether the probative value of the evidence, even if helpful and relevant, is substantially outweighed by the danger of unfair prejudice or of misleading the jury. *Myers,* 359 N.W.2d at 609.

Prior to the trial, the state made a motion *in limine* to suppress the testimony of Dr. Nelson, who conducted several psychological tests on appellant. In the offer of proof—testimony, Dr. Nelson acknowledged that according to the Diagnostic and Statistical Manual Third Revised (DSM–3R), a diagnostic manual recognized by both the medical and psychological professions, at least four of the seven criteria listed under schizoid personality disorder must be met for an individual to be diagnosed as having the disorder. Based on Dr. Nelson's testimony, of the several criteria listed in the DSM–3R, only two characteristics were clearly met. Dr. Nelson

---

5. Minn.Stat. § 609.582, subd. 1 states:

Whoever enters a building without consent and with intent to commit a crime, or enters a building without consent and commits a crime while in the building, commits burglary in the first degree * * * if:

(a) the building is a dwelling and another person not an accomplice is present in it; (b) the burglar possesses, when entering or at any time while in the building * * * a dangerous weapon * * * or; (c) the burglar assaults a person within the building or on the building's appurtenant property.

also testified that even if an individual were suffering from schizoid personality disorder, there is nothing about the disorder that would prevent that individual from honestly confessing to a crime the individual committed.

■ After a thorough analysis of applicable case law following the offer of proof testimony, the trial court ruled that Dr. Nelson could testify as to the nature of schizoid personality disorder, but he could not testify as to whether appellant fit the disorder because that was a question for the jury. As a result of the limitations, the defense chose not to call Dr. Nelson as a witness. We conclude that the ruling was well within the trial court's discretion and did not constitute error.

Next, appellant claims he was denied his constitutional right to a fair trial by the trial court's ruling that Lieutenant Gautsch could testify as to the credibility and reliability of his confession. The testimony in question was as follows:

Q: Did you ever get any sense that he was making up a story, anything like that, any concerns about that?

MR. CARLSON: Objection, invades the province of jury, foundation.

THE COURT: Overruled.

A: Absolutely not.

Q: Why do you say that?

A: I've been involved in a lot of interviews—

MR. CARLSON: Same objection, Your Honor.

THE COURT: Overruled.

A: You get a sense for when a person's telling you the truth. You also—there is technique involved in your interviews, the very things we just discussed.

MR. CARLSON: Same objection, Your Honor, opinion on the ultimate issue.

THE COURT: Overruled.

A: The issues we just discussed, those important points in his statement that were unique to that crime scene that he knew and the number of them that he knew and even his emotional state, the

crying. I had no doubt whatsoever that I was taking a truthful statement.

MR. CARLSON: Standing objection, Your Honor.

THE COURT: Noted.

The concern, of course, is that the credibility of a witness is for the jury to decide, not a witness. *State v. Hines,* 270 Minn. 30, 37, 133 N.W.2d 371, 376 (1964) (holding a witness is not allowed to give a conclusionary opinion or impression as to the subjective intent of the accused because a witness could not have information as to another person's knowledge). The probative value of such testimony is questionable, at best, because of its speculative nature, and the trial court must exercise great caution in determining whether to permit it because of its potential influence on the jury.

In *State v. Ellert,* 301 N.W.2d 320, 323 (Minn.1981), this court held that it was error for the trial court to permit a police officer to testify that, in his opinion, defendant lied when telling him that the shooting was accidental, but that under the circumstances the error was harmless. Officer Gautsch's testimony here was not quite as unequivocal as the police officer's testimony in *Ellert,* but it certainly was close enough to opinion testimony to raise our concern.

■ In cases where there is little more evidence than the contradictory testimony of witnesses, an opinion by a witness for the prosecution as to the credibility of the defendant can be nothing less than telling the jury how to decide the case and can be prejudicial to the defendant. Here, however, the testimony of other witnesses and evidence found at the crime scene made appellant's confession, the subject of Lieutenant Gautsch's opinion on truthfulness, little more than corroborative. Therefore, we conclude there was no prejudice to the appellant in permitting Lieutenant Gautsch to testify as to appellant's credibility.

■ Finally, appellant argues that the trial court erred in permitting Lieutenant Gautsch to sit at prosecuting counsel's table throughout the trial, citing previous decisions of this court expressing disapproval of this practice. *See State v. Schallock,* 281 N.W.2d

186, 187–88 (Minn.1979); *State v. Biehoffer,* 269 Minn. 35, 49, 129 N.W.2d 918, 927 (1964); *State v. Schwartz,* 266 Minn. 104, 111, 122 N.W.2d 769, 774 (1963). We do not retreat from these expressions of concern, as clearly the opportunity for prejudice to the defendant is present where the investigating officer sits at prosecuting counsel's trial table throughout the trial—if for no other reason than the potential for confusion with the jury in the perception of a close alignment between the neutral fact-finding function of the police investigator with the adversary role of the prosecution. Here, however, Lieutenant Gautsch was the first to testify, so he did not hear the testimony of other witnesses before he took the witness stand, he was not in uniform, and there is no indication of inappropriate intimidation. On the record here, we conclude that the trial court did not commit prejudicial error in permitting Lieutenant Gautsch to sit at prosecuting counsel's trial table throughout the trial. *See Schallock,* 281 N.W.2d at 188.

Appellant, in a *pro se* supplemental brief, raises a number of additional issues for our review, all without merit. We affirm the convictions.

Affirmed.