STATE of Minnesota, Respondent,

v.

Samantha Anne HEIGES, Appellant.

No. A09–0300.

Supreme Court of Minnesota.

Aug. 17, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and James C. Backstrom, Dakota County Attorney, Scott A. Hersey, Assistant County Attorney, Hastings, MN, for respondent.

Deborah Ellis, Susan Johnson, St. Paul, MN, for appellant.

OPINION

ANDERSON, PAUL H., Justice.

Samantha Heiges was arrested and charged with second-degree murder and

first-degree manslaughter for allegedly drowning her baby daughter in a bathtub immediately after the baby was born. A Dakota County jury found Heiges guilty of second-degree murder and the Dakota County District Court convicted Heiges of this offense and sentenced her to 299 months in prison. A divided court of appeals panel affirmed Heiges's conviction. Heiges petitioned our court for the review of several issues. We granted review on two issues relating to her confessions to friends and others after the crime was committed.

The first issue Heiges raises is whether a defendant's inculpatory, postoffense, pre-investigation statement acknowledging guilt to a friend satisfies the requirements for a "confession" sufficient to warrant conviction under Minn.Stat. § 634.03 (2010) (providing that a confession "shall not be sufficient to warrant conviction without evidence that the offense charged [was] committed"). The second issue is whether the facts admitted in a defendant's confession can be used to satisfy Minn.Stat. § 634.051 (2010) (requiring that "[n]o person shall be convicted of murder ... unless the death of the person alleged to have been killed, and the fact of the killing by the defendant ... are each established as independent facts beyond a reasonable doubt"). Because we conclude that Heiges's conviction does not violate section 634.03 or section 634.051, we affirm.

In mid–2004, appellant Samantha Heiges lived in Burnsville, Minnesota, with her boyfriend Erik Matlock. Heiges, who was 19 years old, was taking classes at a local university and was also working at two different jobs. Matlock did not have a job and spent most of his time at the couple's apartment while Heiges was either working or at school. Sometime around July 2004, Heiges became pregnant with Mat-

lock's child. The couple did not plan to have a child and did not realize that Heiges was pregnant until sometime around October 2004.

Heiges's and Matlock's accounts of what transpired after they learned Heiges was pregnant differed significantly. Heiges stated that her relationship with Matlock was an abusive one and that Matlock was physically violent toward her on several occasions. She also stated that she was happy about her pregnancy and wanted to keep the baby. She said that Matlock was initially happy about the pregnancy but subsequently decided that he did not want them to keep the baby. Nevertheless, Matlock refused to consider giving the baby up for adoption because he did not want anybody to know that he was the father of a child. Heiges said that at some point Matlock attempted to abort the baby by punching Heiges in the stomach. Despite her stated desire to keep the baby, Heiges also made attempts to end her pregnancy. She said that she did so by drinking large amounts of alcohol and taking drugs.

Heiges said that in the early morning hours of May 6, 2005, she gave birth to her baby and that the baby was born alive. The birth took place in the bathroom at Heiges's apartment in a bathtub filled with approximately one foot of water. Heiges gave birth while alone in the bathroom, but at the end of the delivery, Matlock entered the bathroom. Matlock told Heiges to hold the baby under water and threatened to injure or kill Heiges and the baby if she refused. Heiges then held the baby under water for around two minutes, until the baby stopped trying to breathe. After remaining in the bathroom for a short period of time, Heiges went to her bedroom to lie down to rest. She said that she slept for a few hours. Then, Heiges took the baby's body and put it in a shoe-

box, which was left on the bathroom counter. Two or three days after Heiges gave birth, Matlock put the shoebox in a garbage bag and threw it down the garbage chute in the apartment building where they lived.

Heiges said that she felt depressed following the baby's death and a couple of days later she cut her wrists while in the bathtub where the baby was born. Using her own blood, she started to write the word "Sydney" on the walls of the bathroom. "Sydney" was the name she gave to the baby. Matlock claimed that he found Heiges in the bathroom, bandaged her wrists, and helped her to the bed. Heiges and Matlock's relationship lasted until February 2006 when Matlock moved out of the apartment. In November 2006, Heiges began a new relationship with A.B., and moved out of the apartment where she had previously lived with Matlock and where the baby was born.

As previously noted, Matlock's version of the events surrounding the birth and death of the baby differed in several important aspects from that of Heiges. Matlock denied Heiges's allegation that he was abusive toward her, but he said that Heiges was violent toward him. He testified that he was not present when Heiges gave birth to the baby and did not know if the baby was born alive. He claimed that he first found out that the pregnancy had ended when Heiges came into the bedroom, "naked and wet," and said: "It's done.... You didn't want the baby anyhow...." He also testified that he cleaned up some blood from the bathroom. He denied putting the baby's body down a garbage chute, saying, "I didn't even know we had a garbage chute."

*Heiges Confesses to A.B. That She Drowned Her Baby*

On New Year's Day 2006, A.B., who was in a relationship with Heiges at the time,

finished work and drove to Heiges's apartment. When he arrived at the apartment around 1:00 a.m., A.B. noticed that Heiges appeared to be "slightly drunk." A little later, Heiges began to cry uncontrollably. When A.B. asked Heiges what had happened, Heiges replied that she "had had a baby."

A.B. said he assumed that Heiges was upset because she had given birth to a baby and given it up for adoption. He tried to console Heiges by saying that people who had given children up for adoption could sometimes see their children. Heiges responded: "No, that's not possible. It's dead." A.B. then assumed that Heiges had aborted her pregnancy, but Heiges told A.B. that she had not had an abortion but had "actually physically killed" the baby. She told A.B. that Matlock, the baby's father and her boyfriend at the time, was angry about the pregnancy and that he did not want to keep the baby. A.B. had learned from previous conversations with Heiges that Matlock was abusive and that Heiges was afraid of him. Heiges told A.B. that Matlock had threatened to kill her if she did not kill the baby.

Heiges then proceeded to tell A.B. that she had given birth to a baby girl at her old apartment and drowned the baby in the bathtub. She said that she subsequently had put the baby's body down the garbage chute. A.B. said that when Heiges told him all of this information, she was "hysterical, crying, and trying to control herself but unable to do so." A.B. suggested that Heiges call the police and tell them what happened, but Heiges became angry at this suggestion, and she refused to go to the police.

After the foregoing conversation, A.B. left Heiges's apartment. He went to his parents' house to ask for advice. After talking with his parents, A.B. decided to

call the police to tell them what he had learned. Before he did so, he talked to Heiges again. Heiges told A.B. that she did not remember telling him anything about the baby, but she confirmed that the information she had given him was true. Later that same day, A.B. related Heiges's story to Detective Jeffrey Pfaff of the Burnsville Police Department.

*Initial Police Investigation*

After receiving the information from A.B., Pfaff investigated further. He found an address for Heiges through the Department of Motor Vehicles (DMV), but the address was out of date. The DMV listed Heiges's address as the apartment building where Heiges had lived in May 2005, the time of the alleged incident. Pfaff also used the DMV to identify Matlock, who A.B. had identified as the father of Heiges's baby. Matlock was listed as living at the same address as Heiges. Pfaff then contacted management personnel at the apartment building to verify that Heiges had lived there.

Management personnel at Heiges's old address confirmed that she had lived there. None of the personnel were able to state that they had known for sure that Heiges was pregnant. But the apartment manager testified that when Heiges first moved into the building, she wore "very fitted" clothing, including tank tops and tight t-shirts, and that later Heiges would wear baggy shirts, sweatshirts, and other "very loose fitting" clothing. The manager later testified that she assumed Heiges was pregnant. A staff member who performed maintenance at the apartment also "speculated" that Heiges might be pregnant. The staff member testified that when he saw Heiges holding a baby, he asked Heiges if she had a baby, and Heiges replied that she had not, that the baby "was her sister's." However, the staff member testified that after May 2005,

Heiges lost weight, and resumed wearing "normal clothes," including tank tops.

*Heiges Confesses to Officer Pfaff*

Upon learning that Heiges had lived at the apartment complex, Pfaff decided to contact her. Heiges agreed to speak with Pfaff, and Pfaff interviewed her at her new apartment. Pfaff stated that during the interview he used interviewing "methodologies" to put Heiges at ease. Specifically, he attempted to build rapport with Heiges and adopted a sympathetic demeanor. He also focused on Matlock's abusive nature, and attempted to minimize Heiges's involvement in the events being investigated. Pfaff indicated to Heiges that he considered her to be a victim and told her that he knew Matlock to be a "very abusive person."

During the 49–minute recorded interview, Heiges told Pfaff that she and Matlock were together for one and one-half to two years, and that Matlock did not want Heiges to keep the baby or give it up for adoption. Heiges told Pfaff that she delivered the baby in the bathtub and that Matlock came in and told her that he would harm or kill her and the baby if she did not hold the baby under water. Heiges equivocated on whether her baby was not born alive ("uh-uh"), but she later clarified her story, saying that the baby had been born alive. Heiges also admitted that she held the baby under water for "a couple of minutes." She told Pfaff that she wrapped the baby's body in a towel, and put it in a shoebox. Finally, she told Pfaff that Matlock put the shoebox in a garbage bag, and threw the bag down the garbage chute in the apartment building.

Pfaff spoke to Heiges on three subsequent occasions. During the third interview, Heiges told Pfaff that she had cut her wrists while in the bathtub. When Pfaff asked Heiges why she cut her wrists, she replied, "I just thought it was unfair

she had to die there." During the fourth and final interview, Pfaff asked Heiges if her pregnancy lasted nine months. Heiges said that it did, and that her baby was big. She also said that, during the delivery, Matlock put a sock in her mouth so that the neighbors would not hear any noise as she delivered the baby.

Heiges also told Pfaff that Matlock had used violence to attempt to end her pregnancy. She said that sometime between November and March, four to five months before the delivery, he had "beat [her] in the stomach, and he told [her] that he wasn't going to hurt [her], but he was going to kill the kid." Matlock also told her, "[I]f I can't get rid of this kid, I'm gonna get rid of you to get rid of this kid." Heiges said that around February of 2005, Matlock "ended up strangling me and pretty much almost killed me."

*Landfill Investigation*

Because Heiges had told Pfaff that Matlock disposed of the baby's body in the garbage chute, Pfaff investigated the possibility of recovering the body. In the course of this investigation, Pfaff spoke to several individuals who were involved with trash disposal for the apartment complex where Heiges and Matlock had lived. These individuals testified at trial. A waste disposal manager testified that garbage from the apartment complex was taken to Pine Bend Landfill in Inver Grove Heights. He testified that when trash was dumped into a garbage truck, it was compacted to a size that ranged anywhere from one-tenth to one-half of its original size. He also testified that, once deposited at the landfill, the trash was further compacted.

The operations manager for Pine Bend Landfill testified that between 700 and 1000 tons of trash were dumped at the landfill on any given day. He said that the trash dumped during May 2005 would have been buried under 20 to 24 feet of trash and topsoil by the time of Pfaff's investigation. He also testified that attempting to excavate the area would be dangerous because of the presence of explosive methane gas, and that the chances of finding the baby's remains would be "slim to none." A ground-penetrating radar operator testified that it would be "impossible" for ground-penetrating radar to detect a baby's remains. A police sergeant, who worked with dogs to recover human remains, testified that a search of the landfill for the remains with a cadaver dog would be futile, and extremely dangerous for the dog and its handler. Pfaff testified that based on the foregoing information, he had determined that a search of the landfill for the baby's body would be fruitless.

*Corroboration of Statements by Heiges to Friends and Acquaintances*

As part of his investigation, Pfaff spoke with other acquaintances of Heiges's, several of whom testified at Heiges's trial. At trial, C.C. testified that she met Heiges while studying to be a veterinary technician at the local university they both attended. In the fall of 2004, Heiges told C.C. that she was pregnant. C.C. testified that Heiges put on some weight after this conversation. C.C. also testified that she spoke with Heiges after Heiges had given birth. During this conversation, C.C. asked Heiges how the birth went, to which Heiges responded "Oh, not so good." C.C. also testified that Heiges had told her that Matlock was abusive toward her. J.P., a friend of both C.C. and Heiges, testified that Heiges told him that she was pregnant. He testified that he understood from a conversation with Heiges that she was going to get an abortion. J.P. also testified that Matlock was abusive toward Heiges.

Pfaff also arranged to have Heiges's old apartment examined for forensic evidence.

Andrea Feia, a forensic scientist with the Bureau of Criminal Apprehension, testified that she performed a DNA analysis on some blood found in the apartment. Feia testified that neither Heiges nor Matlock could be excluded as contributors to the DNA mixture, but 75.5 percent of the population could be excluded. Feia also testified that it was "possible" that one of the contributors to the DNA mixture could have been a child of Heiges and Matlock.

Pfaff spoke with three of Heiges's other friends who also testified at Heiges's trial. One of Heiges's coworkers testified that in January 2007, she had noticed that Heiges seemed upset, and as a result invited Heiges over to her apartment to talk. The coworker testified that Heiges told her that she had given birth in May 2005, and that Matlock had caused the baby's death. A high school classmate of Heiges's testified that Heiges had told her in 2007 that Heiges had been pregnant in 2005 but had miscarried. The classmate also testified that she saw bruises on Heiges's body. Another friend testified that she observed Matlock throwing objects at Heiges on one occasion.

*Trial and Confession to R.C.*

On September 20, 2007, Heiges was charged in a complaint with second-degree murder without premeditation under Minn. Stat. § 609.19, subd. 1(1) (2010), and manslaughter in the first degree under Minn. Stat. §§ 609.20(3), 609.101 (2010). Heiges's trial, before a Dakota County jury, began on September 19, 2008. At Heiges's trial, in addition to eliciting the information set forth above, the State introduced the following testimony.

Dr. Lindsey Thomas, a forensic pathologist and Dakota County Medical Examiner, testified for the State. Thomas testified that there would be no forensic value to examining the baby's body if the remains were uncovered over one and one-half years after the baby's death. She also testified that it was consistent with a live birth if a baby moved after birth. Any facial expression would suggest the baby was attempting to cry. Thomas also testified that a stillbirth could be caused by several factors and could occur at any point during a pregnancy. Finally, Thomas testified that the risk of a stillbirth is higher when the mother does not receive prenatal care. Thomas ultimately testified that she was unable to give an opinion on whether the baby was born alive.

The State had originally indicated that Thomas would be its last witness. But before the beginning of Heiges's case-in-chief, a police officer with the Eagan Police Department contacted Pfaff and told him that an individual named R.C. might have information relevant to the case. The district court granted the State's request to allow R.C. to testify. R.C. testified that she met Heiges while they were classmates at the university. She testified that during a class one day, she noticed that Heiges appeared to be pregnant. Heiges confirmed to R.C. that she was pregnant, but asked R.C. not to tell anybody else, because Heiges was trying to keep her pregnancy secret.

Either that same day or the next day, Heiges told R.C. that Heiges and Matlock were trying to get rid of the baby, and that Heiges was drinking full bottles of alcohol, refraining from eating anything for days at a time, and using drugs in an effort to induce a miscarriage. Heiges also told R.C. that if these methods did not work, she planned to deliver the baby at a cabin in northern Minnesota, kill it, and then bury it in the woods. R.C. offered to let Heiges stay with her for a while and to make arrangements to bring the baby somewhere safe. Heiges refused the offer, saying that she did not want to leave her boyfriend. After this conversation, R.C.

called the Eagan Police Department on April 14, 2005, to report her conversations with Heiges. R.C. also testified that Heiges called her after she had given birth. During this call, Heiges told R.C. that she had given birth to the baby in the bathtub, drowned the baby, and kept the baby's body in a shoebox.

At the close of the State's case, Heiges made a motion for judgment of acquittal under Minn. R.Crim. P. 26.03, subd. 18. The basis for the motion was that there was insufficient evidence to corroborate Heiges's confessions under Minn.Stat. § 634.03, and that the death of the victim was not established by independent evidence under Minn.Stat. § 634.051. The district court denied the motion, finding that circumstantial evidence of a live birth, Heiges's attempts to induce a stillbirth or abortion, her concealment of the body, Matlock's unwillingness to act as a father, and Heiges's suicide attempt constituted sufficient evidence to corroborate Heiges's confessions and establish the death of the baby.

On September 30, 2008, the jury found Heiges guilty of second-degree murder and not guilty of first-degree manslaughter. The district court then convicted Heiges of second-degree murder and sentenced her to 299 months in prison.[1]

*Court of Appeals Affirms in Split Decision*

On appeal to the court of appeals, Heiges argued that her confessions to the police were insufficiently corroborated under Minn.Stat. § 634.03, and that there was insufficient evidence presented at trial to support her conviction. *State v. Heiges,* 779 N.W.2d 904, 909–10 (Minn.App.2010). A majority of the court concluded that

"statements made to friends or acquaintances prior to the commencement of a police investigation need not be corroborated and may be used to corroborate a defendant's later confession to police." *Id.* at 911. Accordingly, the court held that Heiges's statements to her friends provided sufficient evidence to corroborate her confessions to Pfaff, and therefore, her conviction did not violate Minn.Stat. § 634.03. *Heiges,* 779 N.W.2d at 913. The court then affirmed Heiges's conviction. *Id.*

The dissent concluded that the term "confession" as used in Minn.Stat. § 634.03 included any statement made after the crime was committed, and therefore, Heiges's statements to her friends could not be used to corroborate any of her other statements. *Id.* at 916–17 [Randall, J., dissenting]. The dissent then concluded that the remaining evidence was insufficient to corroborate Heiges's confessions. *Id.* at 916. Finally, the dissent stated that even if Heiges's confessions could be corroborated under Minn.Stat. § 634.03, her conviction violated Minn.Stat. § 634.051, which the dissent interpreted to require that the death of an alleged victim be proven by evidence independent of the evidence proving the defendant's responsibility. *Id.* at 918–19.

*Petition for Review*

Heiges petitioned for review on several issues. We granted review on two issues. The first issue is whether Heiges's inculpatory, postoffense statements to A.B. and R.C. constitute "confession[s]" under Minn.Stat. § 634.03. The second issue is whether the facts admitted in Heiges's confessions can be used to satisfy Minn. Stat. § 634.051. We now consider each of those issues.

---

1. Matlock was charged with aiding and abetting second-degree murder and aiding an offender after the fact. Charges against Matlock were dropped when Heiges refused to testify against him.

## I.

The first issue before us is whether Heiges's inculpatory, postoffense, preinvestigation statements to A.B. and R.C. constitute "confession[s]" under Minn.Stat. § 634.03. Minnesota Statutes § 634.03, provides: "A confession of the defendant shall not be sufficient to warrant conviction without evidence that the offense charged has been committed. . . ." We have held that the term "confession," as used in section 634.03, refers to a statement made after the commission of the offense in which the defendant implicitly or explicitly acknowledges guilt. *See, e.g., State v. Vaughn*, 361 N.W.2d 54, 56 (Minn. 1985) ("A confession is *any* statement by a person in which he explicitly or implicitly admits his guilt of a crime." (emphasis added)); *State v. Propotnik*, 280 Minn. 556, 558, 158 N.W.2d 861, 862 (1968) (explaining that the defendant's statement to the store owner was not a confession within the meaning of section 634.03 because the statement was exculpatory); *accord Warszower v. United States*, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876 (1941). Only statements that incriminate the defendant require corroboration. *Cf. State v. Sellers*, 507 N.W.2d 235, 236 (Minn.1993) (holding that without corroboration of the State's evidence that petitioner made self-incriminating statements, evidence was not sufficient to sustain the conviction). But a statement need not constitute an acknowledgement of *all* elements of a crime to require corroboration under Minn.Stat. § 634.03. *See Smith v. United States*, 348 U.S. 147, 155, 75 S.Ct. 194, 99 L.Ed. 192 (1954) ("An admission which assumes this importance in the presentation of the prosecution's case should not go uncorroborated. . . ."); *In re Welfare of M.D.S.*, 345 N.W.2d 723, 735–36 (Minn.1984) (requiring corroboration of statements which were incriminating but did not establish all elements of the crime). We have explained that Minn.Stat. § 634.03 has a dual function: it discourages coercively acquired confessions and requires that admissions and confessions be reliable. *M.D.S.*, 345 N.W.2d at 735; *State v. Azzone*, 271 Minn. 166, 170–71, 135 N.W.2d 488, 493 (1965).

*Were Heiges's Inculpatory, Postoffense Statements to R.C. and A.B. Confessions Under Minn.Stat. § 634.03?*

It is undisputed that Heiges's statements to Detective Pfaff constitute confessions under Minn.Stat. § 634.03 because Heiges made those inculpatory statements after the offense was committed. But the court of appeals concluded that Heiges's postoffense statements to R.C. and A.B., in which she admitted killing her baby, were not confessions under Minn.Stat. § 634.03. The court held that "statements made to friends or acquaintances prior to the commencement of a police investigation need not be corroborated and may be used to corroborate a defendant's later confession to police." *Heiges*, 779 N.W.2d at 911. Heiges argues that the court of appeals erred when it restricted the scope of Minn.Stat. § 634.03 in this manner. Therefore the question before us is whether Heiges's statements made to R.C. and A.B. and to others after the offense was committed but before the commencement of the police investigation constitute confessions for purposes of Minn.Stat. § 634.03.

We have never explicitly determined whether statements made by a defendant to friends or acquaintances after the offense, but before the commencement of a police investigation, constitute confessions for the purpose of Minn.Stat. § 634.03. But the plain language of Minn.Stat. § 634.03 provides no basis to exempt statements to friends or acquaintances from its scope. In fact, the second clause of section 634.03 acknowledges that a defendant might con-

fess "to a private person." We have broadly interpreted the term "confession" as used in Minn.Stat. § 634.03 as *any* statement in which a defendant acknowledges guilt of a crime. *See Vaughn,* 361 N.W.2d at 56 ("A confession is *any* statement by a person in which he explicitly or implicitly admits his guilt of a crime." (emphasis added)); *State v. Johnson,* 277 Minn. 230, 236, 152 N.W.2d 768, 773 (1967) ("A confession is an acknowledgment in express terms, by a party in a criminal case, of his guilt of the crime charged...."); *State v. Smith,* 264 Minn. 307, 313, 119 N.W.2d 838, 843 (1962) ("A confession involves the idea of criminality. It applies only to a direct or implied acknowledgement of guilt...."); *State v. McClain,* 208 Minn. 91, 98, 292 N.W. 753, 756 (1940) ("A confession is defined as an acknowledgment of guilt of the crime charged or of the facts which constitute the crime...."). Based on the language of section 634.03 and our case law, we conclude that the term "confession" in section 634.03 is broad enough to cover *all* acknowledgments of guilt made after a crime is committed, whether the acknowledgement is made to a friend, acquaintance, or to the police.

Our interpretation of the term "confession" in this case is consistent with our interpretation of the term "confession" in the context of similar statutes that use the term "confession." *See State v. New,* 22 Minn. 76, 3 (1875) (holding that the defendant's confession to an agent of the defrauded company required corrobora-

tion);[2] *State v. Laliyer,* 4 Minn. 368, 6–7, (Gil. 277) (1860) (holding that a confession made to a witness before the commencement of the investigation required corroboration). Because the court of appeals concluded that postcrime, preinvestigation statements to friends acknowledging guilt were not "confessions" requiring corroboration, we conclude that the court of appeals holding is inconsistent with our case law. Moreover, the cases on which the court of appeals relied are inapplicable. The court of appeals justified its limited definition of "confession" by relying on *State v. Koskela,* 536 N.W.2d 625 (Minn. 1995), and *State v. Hauk,* 257 Wis.2d 579, 652 N.W.2d 393 (Wis.Ct.App.2002).

In *State v. Koskela,* 536 N.W.2d at 629, the defendant claimed the State presented insufficient evidence on the intent element of a burglary charge because the only evidence that he entered the apartment to rob the victim was his uncorroborated confessions to his acquaintances. We rejected Koskela's insufficiency of the evidence claim, explaining:

> Evidence of the necessary intent is clearly supplied by the testimony of both [acquaintances], who stated that [Koskela] told them that he entered the apartment with the intent to rob the victim. Further, the fact that [Koskela] entered the victim's dwelling by leaping onto the victim's balcony at approximately 6:00 a.m. could lead a jury to reasonably conclude that [Koskela] entered the

---

**2.** We have also characterized statements made to friends of the defendant before the commencement of the police investigation as "confessions" in other contexts. *See King v. State,* 649 N.W.2d 149, 154 n. 2 (Minn.2002) ("The misrepresentation in the affidavit chiefly concerned appellant's alleged confession of the murder to acquaintances."); *State v. Scott,* 493 N.W.2d 546, 547 (Minn.1992) ("[T]he admission of evidence of his separate-

ly-tried and nontestifying codefendant's extrajudicial *confession to a mutual acquaintance* in defendant's presence that defendant and he killed Yungk violated defendant's sixth amendment right of confrontation." (emphasis added)); *State v. Zaccardi,* 280 Minn. 291, 294, 159 N.W.2d 108, 109–10 (1968) (characterizing statements made by the defendant to coworkers before the police investigation commenced as confessions).

dwelling with the intent to commit burglary.

*Id.* In other words, we concluded that the manner and time of entry corroborated Koskela's statements to the acquaintances. Thus, we held there was sufficient evidence for a jury to determine that Koskela had the intent to commit burglary when he entered the victim's apartment based on the circumstances surrounding the offense, the manner and time of entry, and the statements and declarations appellant made to other individuals. *Id.* In so holding, we said:

> Based on the circumstances surrounding the offense, the manner and time of entry, and the *statements and declarations appellant made to other individuals,* we conclude that there was sufficient corroborative evidence for a jury to determine that appellant had the intent to commit burglary when he entered the victim's apartment.

*Id.* (emphasis added).

The court of appeals concluded that the foregoing language from *Koskela* implied that the State could use a defendant's statement to an acquaintance after the offense is committed, but before the commencement of a criminal investigation, to corroborate a confession, and therefore such a statement could not be a confession. But the issue in *Koskela* was not whether Koskela's statements to his acquaintances were confessions. Instead, the issue was whether the record contained evidence that corroborated Koskela's statements to the acquaintances. We conclude that *Koskela* cannot be read to mean that an inculpatory, postoffense statement to acquaintances is not a "confession" under Minn.Stat. § 634.03 because that issue was not presented in *Koskela* and because such a reading is contrary to our case law discussing the definition of a confession.

The court of appeals also relied on *State v. Hauk,* 652 N.W.2d 393. In *Hauk,* the Wisconsin Court of Appeals said that "the main concern behind the corroboration rule is that an accused will feel 'coerced or induced' when he or she 'is under the pressure of a police investigation' and make a false confession as a result." *Id.* at 401. The Wisconsin court concluded that such concerns were not implicated when a confession was made to a friend before a police investigation was initiated. *Id.* But we have articulated a purpose behind the corroboration requirement in section 634.03 that the Wisconsin court did not mention when discussing its common-law corroboration requirement—ensuring the reliability of a confession. *See M.D.S.,* 345 N.W.2d at 735; *Azzone,* 271 Minn. at 171, 135 N.W.2d at 493 n. 2 ("Even when confession [sic] is made to private persons and even if entirely voluntary, the statute applies."). Because the Wisconsin court's analysis focused on only one of the purposes underlying Minn.Stat. § 634.03, we conclude that *Hauk* is not persuasive on the issue before us.

■ The language of Minn.Stat. § 634.03, our case law discussing the term "confession," and the cases cited by the court of appeals, provide no basis for limiting the meaning of "confession" so as to exclude statements made to friends and acquaintances after the offense, but before the commencement of a police investigation. Therefore, we conclude that the term "confession" encompasses all statements made after the commission of the charged offense in which the defendant acknowledges guilt of the crime either implicitly or explicitly. Applying this definition of "confession" to the facts of Heiges's case, we conclude that Heiges's statements to A.B. and R.C. acknowledging that she killed her baby were confessions subject to

the corroboration requirement of Minn. Stat. § 634.03.

## II.

 The next issue before us is whether Heiges's confessions to A.B., R.C., and Pfaff were corroborated by sufficient "evidence that the offense charged has been committed" under Minn.Stat. § 634.03. We have said, following the lead of the United States Supreme Court in *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), that Minn. Stat. § 634.03 does not require that each element of the offense charged be individually corroborated. *M.D.S.*, 345 N.W.2d at 735 (citing *Opper*, 348 U.S. at 92–93, 75 S.Ct. 158). Instead, Minn.Stat. § 634.03 only requires " 'independent evidence of attending facts or circumstances from which the jury may infer the trustworthiness of the confession.' " *M.D.S.*, 345 N.W.2d at 735 (citing *Opper*, 348 U.S. at 92–93, 75 S.Ct. 158).

Heiges admitted seven significant facts in her confessions to R.C., A.B., and Pfaff. First, in May 2005, she was 9–months pregnant with Matlock's child. Second, before May 2005, she and Matlock engaged in behavior designed to end the pregnancy because they did not want the baby. Third, Heiges planned to kill the baby after delivery and bury the baby in the woods near a northern Minnesota cabin. Fourth, on May 6, 2005, Heiges gave birth to the baby in the bathtub of the couple's Burnsville apartment. Fifth, Matlock, who had physically abused Heiges in the past, threatened to hurt her if she did not drown the baby. Sixth, Heiges drowned the baby and put the baby's body in a shoebox, which she placed in the apartment garbage chute. Seventh, despondent over the baby's death, Heiges cut

her wrists in the same bathtub where she gave birth to and drowned the baby.

The State submitted evidence independent of Heiges's confessions that corroborated each of the significant facts admitted by Heiges.[3] To corroborate Heiges's pregnancy, the State presented the following evidence. Employees at Heiges's apartment building testified that when Heiges first moved into the building, she wore "very fitted" clothing, including tank tops, that Heiges later began wearing baggy shirts and other "very loose fitting" clothing, and that after May 2005, Heiges lost weight, and resumed wearing "normal clothes," including tank tops. R.C., C.C., and J.P. all testified that in the months preceding May 2005, they each observed that Heiges appeared to gain weight, which was consistent with Heiges's preoffense disclosure that she was pregnant. Matlock testified that in May 2005 Heiges was pregnant with his child.

As corroboration of the couple's efforts to end the pregnancy and their plan to kill the baby, the State presented the following evidence. R.C. testified that Heiges made several preoffense disclosures to her. Heiges told R.C. that she and Matlock were trying to abort the baby. Heiges told R.C. that she was drinking full bottles of alcohol, refraining from eating anything for days at a time, and using drugs, and that Matlock punched her in the stomach, all in an effort to induce a miscarriage. Heiges further told R.C. that if these methods did not work, she planned to deliver the baby at a cabin in northern Minnesota, kill it, and then bury it in the woods.

The State presented the following evidence to corroborate the baby's birth in the bathtub of the couple's apartment.

---

**3.** Though the state corroborated every fact admitted in Heiges's confessions, corroboration of every fact is not required under Minn. Stat. § 634.03. *M.D.S.*, 345 N.W.2d at 735.

The State's forensic scientist testified that she performed a DNA analysis on some blood found in the apartment's bathroom. Based on that analysis the forensic scientist testified that it was "possible" that one of the contributors to the DNA mixture could have been a child of Heiges and Matlock, and that neither Heiges nor Matlock could be excluded as contributors to the DNA mixture (but 75.5 percent of the population could be excluded). Matlock testified he cleaned up blood from the bathroom, after Heiges . told him, "It's done. . . . You didn't want the baby anyhow."

To corroborate Heiges's statement that Matlock physically abused her in the past and threatened to hurt her if she did not drown the baby, the State presented the following evidence. A classmate of Heiges's testified that she saw evidence of bruises on Heiges's body. Another friend stated that she observed Matlock throwing objects at Heiges on one occasion. C.C. and J.P. also testified that Matlock was abusive toward Heiges.

The State also presented evidence to corroborate Heiges's statement that a few days after the killing, she cut her wrists in the bathtub of the couple's Burnsville apartment and wrote the name "Sydney" on the wall because she felt it was unfair that her baby "had to die there." Matlock testified that Heiges cut her wrists in the bathroom a few days after the pregnancy ended. The forensic scientist testified that Heiges could not be excluded as the source of blood found in the bathroom.

As evidence that Heiges complied with Matlock's directive to drown the baby and disposed of the baby's body in the apartment garbage chute, the State presented the following evidence. Matlock testified that Heiges came into the bedroom, "naked and wet," and said "[i]t's done. . . . You didn't want that baby anyhow." Matlock also testified that Heiges tried to commit suicide a few days after the pregnancy ended, which tends to show that she felt severe regret and sadness. A State forensic examiner testified that there was a garbage chute in the couple's Burnsville apartment.

We conclude that the evidence described above is sufficient to satisfy the corroboration requirements of Minn.Stat. § 634.03 because it constitutes independent evidence of attendant facts and circumstances from which the jury may infer the trustworthiness of Heiges's confessions.[4]

In sum, while we conclude that the court of appeals erred when it determined that Heiges's statements to A.B. and R.C. were not confessions that needed to be corroborated, we nevertheless conclude that the State presented sufficient evidence to corroborate the attendant facts and circumstances of Heiges's confessions to A.B., R.C., and Pfaff. More specifically we conclude that there was sufficient corroborating evidence from which the jury could infer the trustworthiness of all three of Heiges's confessions. Therefore, we hold that Heiges's conviction did not violate Minn.Stat. § 634.03.

### III.

Heiges argues that even if her confessions were corroborated, there was insuffi-

4. The trustworthiness of Heiges's confession to A.B. is independently bolstered by the circumstances surrounding that confession. According to A.B., Heiges was emotional when she told him the story about how the baby died. The fact that A.B. was sufficiently persuaded by the truth of Heiges's confession to bring the story to the police supports its trustworthiness. Finally, the trustworthiness of Heiges's confession to A.B. is further supported by the fact that Heiges repeated the story to A.B. the following day, despite being unable to remember telling him the story the previous evening.

cient evidence to sustain her conviction under Minn.Stat. § 634.051. This statute provides that "[n]o person shall be convicted of murder or manslaughter unless the death of the person alleged to have been killed, and the fact of the killing by the defendant, as alleged, are each established as independent facts beyond a reasonable doubt." Heiges asserts that the phrase "independent facts" as used in Minn.Stat. § 634.051 prohibits the State from using her confessions to prove both that she killed the baby and that the baby is dead. The State argues that Minn.Stat. § 634.051 simply restates the elements of the crime of second-degree murder.

 The de novo standard controls our review of statutory interpretation issues. *State v. Loge,* 608 N.W.2d 152, 155 (Minn.2000). Our analysis of a statute depends on our initial determination of whether the statute is ambiguous. A statute is ambiguous when it is susceptible to more than one reasonable interpretation. *Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 760 (Minn.2010). If we conclude that a statute is unambiguous, we give effect to its plain meaning. Minn. Stat. § 645.16 (2010). In construing statutes, we cannot supply that which the Legislature purposely omits or inadvertently overlooks. *Hutchinson Tech., Inc. v. Comm'r of Revenue,* 698 N.W.2d 1, 8 (Minn.2005). But if a legislative omission causes an ambiguity of expression resulting in more than one reasonable interpretation of the statute, then we may go outside the language of the statute to determine legislative intent. *Premier Bank,* 785 N.W.2d at 760; *Beardsley v. Garcia,* 753 N.W.2d 735, 737 (Minn.2008). Thus, if the statute is ambiguous, we may refer to extrinsic sources to determine the legislative intent. Minn.Stat. § 645.16. Further, when construing a statute, we must, if possible, give effect to all of the statute's provisions. *Id.*

The first step in our analysis is to determine whether the phrase "established as independent facts," as used in Minn.Stat. § 634.051, is ambiguous. When considering the plain and ordinary meaning of words or phrases, we have considered dictionary definitions. *State v. Hartmann,* 700 N.W.2d 449, 453–54 (Minn.2005). Black's Law Dictionary defines "independent" as "[n]ot dependent or contingent on something else." *Black's Law Dictionary* 785 (8th ed.1999). When we use the foregoing definition for independent, it becomes evident that the legislature has not explicitly set out the "something else" on which the "facts" should not be "dependent or contingent." Nevertheless, we conclude that this omission does not render the statute susceptible to more than one reasonable interpretation. We also conclude that when the foregoing definition of independent is used, the only reasonable interpretation of the statutory language is one that neither party identifies.

We begin the next part of our analysis by explaining why the interpretations proposed by the parties are unreasonable. We then discuss the only reasonable interpretation of the phrase "established as independent facts," as used in Minn.Stat. § 634.051. The State argues that we should read Minn.Stat. § 634.051 to require only what the second-degree murder statute requires, i.e., the death of the victim and the killing of the victim by the defendant. But under Minn.Stat. § 645.16, we must construe every statute, if possible, to give effect to all of the statute's provisions, and here the construction advanced by the State would render the term "independent" meaningless. Heiges's proposed reading of the statute is equally flawed. She argues that we should read Minn.Stat. § 634.051 to require that

the death of the victim be proved by evidence independent of her confessions. But Heiges's argument is deficient because the plain language of Minn.Stat. § 634.051 does not mention confessions and does not otherwise support such a reading.[5]

Having concluded that the interpretations proposed by the parties are flawed, we next look to see if there is a way to read the statute so that there is only one reasonable interpretation. We conclude that there is one reasonable interpretation and that the only reasonable interpretation of the statutory phrase "to establish as independent facts" is that the facts—not the source of those facts—be independent. Further, facts are independent of each other when the evidence establishing the separate facts is not identical evidence or is not dependent or contingent evidence. Reading the statute to require that the evidence establishing facts must not be identical, contingent, or dependent does not render the term "independent" meaningless, nor does it require us to supply language that the Legislature has omitted. Accordingly, we conclude that Minn.Stat. § 634.051 requires that the evidence proving the death of the victim must be established independently of the evidence proving the killing of the victim by the defendant.

Under our reading of Minn.Stat. § 634.051, the relevant question is whether there is any evidence which establishes the victim's death which is independent of— not identical, contingent, or dependent on—evidence establishing the defendant's responsibility for the death. Thus, Minn.Stat. § 634.051 does not require, as Heiges asserts, that the death of the victim and the fact of the killing by the defendant each be established by evidence independent of the defendant's confession. Rather, Minn.Stat. § 634.051 requires that the jury may not infer the death of the victim *only* from evidence which also tends to establish the defendant's responsibility for the alleged crime. In other words, it is impermissible for the State to ask the jury to conclude that the victim is dead from the fact that the defendant claimed responsibility for killing the victim. The evidence offered in the case, including the defendant's confession, must otherwise tend to establish that the victim is dead.

Here, the death of Heiges's baby was established independently of the killing of the baby by Heiges. The evidence that established the death of Heiges's baby was not identical to, contingent, or dependent upon the evidence that established Heiges's responsibility for the baby's death. The death of the baby was established by the following evidence: (1) When Pfaff asked Heiges, "Would you say a couple of minutes it took her to ... quit grasping [sic] for air and be done?" Heiges replied "Yeah." (2) Heiges also said, "I just thought it was unfair that she had to die there." (3) Finally, several people testified that they saw Heiges pregnant, with a baby that was never revealed alive to the outside world.

The evidence which established that Heiges was responsible for the killing was not dependent or contingent on the foregoing evidence. More specifically, there was independent evidence that Heiges killed the baby: Heiges told three people, Pfaff,

5. Minnesota Statutes § 634.051 could be read to mean that facts establishing death and facts establishing killing must not be dependent on *anything* else. But this reading, while grammatically plausible, would require that the evidence used to establish the death of the victim be completely separate from the evidence used to establish the defendant's responsibility. We conclude that this reading is not reasonable. *See* Minn.Stat. § 645.17 (2010).

A.B. and R.C., that she killed her baby. While it is true that Heiges's statements that she killed her baby necessarily implied that the baby was dead, the facts used to establish the death of the baby and the facts used to establish Heiges's responsibility for the death are independent of each other, and therefore, we conclude that Heiges's conviction did not violate Minn.Stat. § 634.051.

### IV.

■■■■■ Having concluded that Heiges's conviction did not violate Minn.Stat. § 634.051, we must determine whether all of the evidence, including Heiges's confessions, is sufficient to sustain her conviction. In considering the sufficiency of the evidence, our review is limited to a "painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach the verdict that they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). The reviewing court must assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989).

■■■ Here, the jury found Heiges guilty of second-degree intentional murder. Under Minn.Stat. § 609.19, subd. 1, second-degree intentional murder is established when a person "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." When Heiges's confessions are taken into account, there is sufficient evidence to support her conviction of second-degree murder. Heiges stated during her interviews with Pfaff that she gave birth to a live baby. Heiges also stated that she held her baby under water until the baby stopped breathing. A jury may infer criminal intent from the nature of a killing. *See State v. Young,*

710 N.W.2d 272, 278 (Minn.2006). We conclude that a jury could have inferred that Heiges intended to kill her baby from the fact that she held the baby under water until the baby stopped breathing. Therefore, we hold that the evidence was sufficient to support Heiges's conviction.

Affirmed.